Jessie TURNER; Christine Brownlee; Jack Foster; Alan Smith; and Freddie Lyon, Plaintiffs,

v.

The STATE OF ARKANSAS; Bill Clinton, Governor of the State of Arkansas; William J. McCuen, Secretary of State of the State of Arkansas; John M. Lipton, Speaker of the Arkansas House of Representatives; and Jerry P. Bookout, President Pro Tempore of the Arkansas Senate, Defendants.

Civ. No. LR–C–91–295.

United States District Court, E.D. Arkansas, W.D.

Submitted Aug. 12, 1991.

Decided Nov. 15, 1991.

Bob R. Brooks, Jr., Hilburn, Calhoon, Harper, Pruniski & Calhoun, Ltd., North Little Rock, Ark., W. Asa Hutchinson, Karr & Hutchinson, Fort Smith, Ark., for plaintiffs.

Tim C. Humphries, Atty. General's Office, Little Rock, Ark., for defendants.

P.A. Hollingsworth, Hollingsworth Law Firm, P.A., Little Rock, Ark., Olly Neal, Jr., Wilson, Bell & Neal, Marianna, Ark., for intervenors-plaintiffs.

Jim Malone, Jr., pro se.

Before Theodore McMILLIAN, Circuit Judge, G. Thomas EISELE, Senior District Judge, and Henry WOODS, District Judge.

## MEMORANDUM OPINION AND ORDER

EISELE, Senior District Judge.

Defendants' motion to dismiss or alternatively for summary judgment is before the Court. This is a voting rights case in which a three-judge court has been appointed. For the reasons discussed below, the Court will grant in part and deny in part the motion for summary judgment.

There are three issues. First, this Court has been asked to decide whether the State of Arkansas, its governor and legislature violated the Fourteenth and Fifteenth Amendments to the Constitution when it enacted legislation aligning and redistricting the four congressional districts in the state. Second, this Court has been asked to decide whether the same legislation violated Section 2 of the Voting Rights Act. Finally, this Court must decide whether that legislation resulted in an unconstitutional malapportionment of the population in violation of the "one person, one vote" standard. The Court will first consider the Voting Rights Act question, followed by a discussion of the Fourteenth and Fifteenth Amendment questions and, finally, the one person, one vote issue.

<u>OUTLINE</u>

Page

I. Background ........................................................ 556
II. Summary Judgment Standard ............................................ 558
III. Overview and Context of Central Issues................................. 559
IV. A Touch of Political Reality ............................................ 563
V. Voting Rights Act Claim................................................ 564
    A. Section 2 and the preconditions of <u>Thornburg v. Gingles</u> ............. 565
    B. Is Section 2 an affirmative action statute? ........................... 572
    C. Another barrier: The <u>dual proof requirement of Section 2</u> ........... 574
VI. Intentional Racial Discrimination—The Constitutional Claims .............. 578
VII. Malapportionment..................................................... 583
VIII. Conclusion ......................................................... 584

## I. BACKGROUND

The Arkansas Legislature passed Act 1220 in the 1991 legislative session. The Act provided for the redistricting of the Congressional Districts in the State of Arkansas to conform to the revised population figures of the 1990 Decennial United States Census. Governor Bill Clinton signed the bill into law on April 10, 1991.

Act 1220, also referred to as Senate Bill 691, or the "Dowd–Harriman" plan (after its sponsors in the Arkansas State Senate) split the state into four separate districts: Pulaski County and the surrounding counties generally form a district as the central hub of the state, District 2. The other three districts complete the wheel around the hub: District 1 is in northeast Arkansas; District 3 is in northwest Arkansas; and District 4 is in what might appropriately be termed the southern part of the state.

The apportionment plan enacted by the legislature and signed by the governor follows closely the apportionment plan designed and implemented by this Court in

1982. *Doulin v. White,* 535 F.Supp. 450 (E.D.Ark.1982) (malapportionment case). The legislative history to the 1991 Act and Act 1220 itself show that the Arkansas legislature gave preference to plans that departed as little as possible from the remedy implemented in *Doulin.* *See* paragraph 3 of House Concurrent Resolution 1006 (February 4, 1991), attachment 5 to defendants' motion, which states, *inter alia,* that preference shall be given "to a plan which departs as little as possible from the 1981 apportionment plan as developed by the Court in *Doulin v. White,* so long as such plan is otherwise constitutionally acceptable."

Plaintiffs' challenge is to the new 1991 districting plan. That plan was made necessary only because of relatively slight population shifts. The following shows the total population and the total black [1] population figures for the 1982 *Doulin* created districts based on the 1980 census and also the 1990 census figures for the same (1982) congressional districts: [2]

---

**1.** The original plaintiffs refer to themselves as "blacks." The Walker intervenors consistently use the term "African Americans." The Court is sensitive to the nuances involved but has chosen to use the term "blacks" throughout this opinion, thus, in effect, letting the original plaintiffs establish the appropriate protocol. The Court

trusts that no one will be offended by the adoption of the convention.

**2.** All of the figures used in this opinion have been stipulated by the parties or have been derived by mathematical computations based on those stipulated figures.

NUMBER AND PERCENT BLACK IN CURRENT CONGRESSIONAL
DISTRICTS (1982 BOUNDARIES): 1980 POPULATION AND 1990 POPULATION

| DISTRICT | 1982 BOUNDARIES WITH 1980 POPULATION | | |
|---|---|---|---|
| | Total | Black | Percent |
| First | 573,551 | 107,604 | 18.8% |
| Second | 569,116 | 95,739 | 16.8% |
| Third | 572,937 | 11,794 | 2.1% |
| Fourth | 570,831 | 158,631 | 27.8% |
| | 2,286,435 | 373,768 | 16.3% |

| DISTRICT | 1982 BOUNDARIES WITH 1990 POPULATION | | |
|---|---|---|---|
| First | 555,487 | 101,702 | 18.3% |
| Second | 612,672 | 106,931 | 17.5% |
| Third | 632,411 | 13,391 | 2.1% |
| Fourth | 550,155 | 151,888 | 27.6% |
| | 2,350,725 | 373,912 | 15.9% |

It will be seen that, during the decade, the overall state population increased 64,290 or 2.8%. The great bulk of that increase (59,474) was in the Third Congressional District, which has a black population of approximately 2%. And the pleadings make it clear that the Third Congressional District does not really come into play in the lawsuit. The Complaints of the plaintiffs and of the black Intervenors refer to, and complain about, the First, Second and Fourth Districts. See paragraphs 24, 28, 32(d), 32(e), 32(g), and 33 of the Complaint and paragraphs 40, 46, 47 and 50 of the Complaint in Intervention. The total increase in the combined population of those three districts from 1980 to 1990 is 4,816 or 0.2%. However, among those three districts, the First decreased 18,064 or 3%; the Second increased 43,556 or 7.7%; and the Fourth decreased 20,676 or 3.6%. The racial mix in the three districts changed very little between 1980 and 1990: the First went from 18.8% black to 18.3%; the Second from 16.8% to 17.5%; and the Fourth from 27.8% to 27.6%.

Of the total population of Arkansas in 1991 (2,350,725), 373,912 persons, or 15.9%, are black. This is down from 16.3% in 1980. The number of blacks of voting age, however, is 237,502 which is only 12.73% of the state's total voting age population.

Under Act 1220 of 1991 the black percentage of total population in the three implicated districts changed as follows:

| | 1980 BOUNDARIES | | 1991 BOUNDARIES |
|---|---|---|---|
| | 1982 | 1991 | 1991 |
| First | 18.8% | 18.3% | 17.9% |
| Second | 16.8% | 17.5% | 17.6% |
| Fourth | 27.8% | 27.6% | 26.6% |

The voting age figures for blacks changed as follows:

| | 1980 BOUNDARIES | | 1991 BOUNDARIES |
|---|---|---|---|
| | 1982 | 1991 | 1991 |
| First | 15.6% | 15.3% | 14.8% |
| Second | 14.5% | 15.1% | 15.2% |
| Fourth | 24.6% | 24.7% | 23.74% |

To meet a theoretically perfect "one person one vote" test, the First District would need to gain 32,194 persons; the Second would have to lose 24,991 persons; the Third would have to lose 44,730; and the Fourth would have to gain 37,526.

This, then, is the factual situation which confronted the Arkansas Legislature (the "General Assembly") when it took up the redistricting issue in 1991.

The legislature obviously used the *Doulin* Court's plan as a starting point when it formulated Act 1220. The two plans are markedly similar. The differences between the two plans may be quickly summarized: by virtue of the 1991 Act, District 2, at the center of the state, gained Van Buren County, with a 1990 population of 14,008, from District 1 in the northeast corner; District 2 lost Lonoke County, with a 1990 population of 39,268, to District 1; District 2 therefore had a net loss of population to District 1. District 3 lost four counties and District 4 gained three counties. In the northern part of the state, District 3 lost Searcy County, with a 1990 population of 7,841, to District 1. In the southern part of the state, District 3 lost three counties to District 4: Howard County with a 1990 population of 13,569; Montgomery County with a 1990 population of 7,841; and Sevier County with a 1990 population of 13,673. In summary, a total of six counties with an aggregate 1990 population of 96,164 were changed and moved about among the various districts. The same values that the Court in *Doulin* found appropriate are preserved by Act 1220.[3]

The 1990 population of the state was 2,350,725. The theoretical population of each congressional district that will assure a mathematical "one person, one vote" result is therefore 587,681, or one-fourth of the total population of the state. The populations of the congressional districts as mandated in Act 1220 are as follows: District 1, northeast Arkansas: 588,588; District 2, Pulaski County and central Arkansas: 587,412; District 3, northwest Arkansas: 589,523; District 4, south Arkansas: 585,202. The total variance from the ideal size is therefore .73%.

## II. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."

In *Lujan v. National Wildlife Federation*, —— U.S. ——, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), the United States Supreme Court stated that "regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the District Court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* 110 S.Ct. at 3187 (quoting *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). The *Lujan* Court further stated that where the nonmoving party will carry the burden of proof at trial, "Rule 56 does not require the moving party to *negate* the elements of the nonmoving party's case." *Id.*

Once a party has carried its burden under Rule 56, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Although the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the summary judgment motion,

---

**3.** HB 2071 favored by the plaintiffs and the black intervenors would constitute a radical departure not only from the *Doulin* plan but from all previous congressional redistricting plans in that it would split counties and cities. It would create a district stretching from the northeast corner of the state to the southwest corner. It would change the representation of over 750,-000 people in more than twenty counties.

*United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), this does not mean that the nonmoving party may simply rest upon general allegations in the complaint or assertions that there exists a genuine issue of fact. *See Lujan*, 110 S.Ct. at 3188.

### III. OVERVIEW AND CONTEXT OF CENTRAL ISSUES

What was said in *Jeffers v. Clinton*, 730 F.Supp. 196, 227 (E.D.Ark.1989) (Eisele, C.J., dissenting) applies equally here:

> It is my view that many Voting Rights cases, such as this one, are changing the political landscape of America in fundamental ways without legislative mandate and without the benefit of scholarly legal and political discourse. In so doing these cases are, in an almost inadvertent manner, redefining the nature of our democratic form of government, contrary, I believe to the Constitution.
>
> Do we really believe in the idea of one political society or should this be a nation of separate racial, ethnic, and language political enclaves? Surely such issues are worthy of serious, focussed debate and discussion. Ironically, there has been precious little of either.

This case carries the effort to concentrate black voters into fewer and fewer districts a step beyond that already taken in *Jeffers v. Clinton*.[4] If successful, it would leave our nation but one short step removed from a system of representative government based on race, ethnic origin and language, (is religion next?), in which system district lines would be irrelevant. We would then end up with a system of pure proportionate representation predicated upon factors that *should be* completely irrelevant in the political life of a democratic society. But it is not necessary to take that additional step in order to end up with a system of proportionate representation based on race. The *Jeffers* rationale, if permitted to stand, will bring us close to

that end and plaintiffs' success here would, for practical purposes, complete the process.

Cases such as this thrust us into the political thicket. There is no reason to deny this reality. We must search for a principled context for guidance. Revitalization of Section 4 of Article IV of our Constitution, the guarantee of a Republican Form of Government, has been suggested.[5] In any event we must recognize that traditional narrow legal principles must yield to larger legal-political considerations, for we are dealing with the essence of our democratic society. We do not, therefore, hesitate to cite those outside the legal community who have given thought to these issues.

Ms. Abigail Thernstrom has written with insight in the area. In her book, *Whose Votes Count?*, she states:

> It might be said that blacks in *every* jurisdiction benefit from having their own in office. However, that is an argument not for federal intervention but for black political organization. "The extension of trust or 'friendship' beyond the family and of citizenship beyond race, ethnicity, and religion, is a significant political achievement," Michael Walzer has written. "I think," he adds, "we will want ... to limit the ways in which group membership counts as a qualification for office, much as we limit the ways in which blood relationship counts, and for similar reasons." In amending section 2, [of the Voting Rights Act] Congress unequivocally and wisely rejected the notion of group entitlement to even one legislative seat.
>
> * * * * * *
>
> Perhaps the most important [cost attached to maximizing minority office holding] is the danger that categorizing individuals for political purposes along lines of race and sanctioning group membership as a qualification for office may inhibit political integration. As James

---

**4.** *Jeffers v. Clinton*, 730 F.Supp. 196 (E.D.Ark. 1989), 740 F.Supp. 585 (E.D.Ark.1990). *Jeffers* required the creation of almost as many super-majority black state legislative districts as it was possible to create in the state of Arkansas. This case seeks the creation of a "superminority" black district when there are not enough black voters to constitute a majority district.

**5.** See *Jeffers*, 730 F.Supp. 196 at 232–239.

Blumstein argued at the 1982 Senate hearings, such categorization amounts to a racial "piece-of-the-action approach," perhaps freezing rather than thawing the previous system of racial politics. The heightened sense of group membership works against that of common citizenship. And as Donald Horowitz pointed out at those same hearings, ethnic boundaries, by diminishing the sense of common citizenship, may "ultimately smother democratic choice and threaten democratic institutions."

This same point was made again very recently by Mr. Stuart Taylor, Jr. in "Voting By Race", *American Lawyer*, June 1991, *Id.* at pp. 50, 51:

More fundamentally, these developments raise the question whether some voting rights suits and remedies now being pursued around the country may—in the long run—do more harm than good, by spurring politicians to appeal only to members of their own race, and by putting the law's imprimatur on the notion that it's only natural to vote along racial lines.

\* \* \* \* \* \*

Are voting rights suits entrenching separate-but-equal elections as a permanent feature of the American landscape? Are they institutionalizing the kind of racially polarized politics we should be trying to get away from? Might they leave minorities and their representatives isolated?

\* \* \* \* \* \*

Almost every step that has been taken down this road has a certain logic. But with each new step—with almost no public debate—we seem to be perpetuating racial divisions by carving a principle of racial separation into our electoral system.

\* \* \* \* \* \*

The net long-term effect of creating as many black- and Hispanic-majority voting districts as possible could be to reduce black and Hispanic voters' influence over policy makers generally, by leaving many white officeholders with little incentive to court them.

And in August, 1991, Mr. Charles Lane, a general editor of *Newsweek*, wrote about the districting process used in developing New York City's plan for 51 new city-council districts:

Above all, the New York districting battle is a case study in how the Voting Rights Act, once one of the most potent weapons in the battle to overthrow segregation in the South, has come to be a tool to institutionalize racial separatism in American politics.

\* \* \* \* \* \*

This superficially progressive policy places a different value on the races for purposes of representation. It subtly sanctions the notion that minorities need only aspire to a second-class level of political awareness and activity. Rather than strengthening minority political power, the system arguably undermines it by confining minority influence to a single, concentrated area. And safe race-based districts, in which candidates need only take account of the interests of their own group, are a potential breeding ground for extremists of all races.

Mr. Lane next described the overt political in-fighting involved in developing the New York City redistricting plan. He then observed:

Those deliberations took place in an atmosphere of jarringly frank racial politics. Members referred to one another by group, as in "the African–American commissioner" or "the Asian–American commissioner." Blacks who lived outside planned black districts were referred to as "wasted." The "wasted" blacks in a housing project in upper Manhattan were "exported" from a "Dominican district" and "imported" to a black district nearby. The switch left the black district looking like a giant crab claw, pinching each side of the Latino zone. Greeks in Queens briefly pressed a claim before the commission. A disabled man presented a map purportedly showing concentrations of disabled voters. At one hearing, a "Latino of African–American descent" demanded the whole commission resign. These pleas were ignored. But the commission did create a

Manhattan district designed to elect an openly gay or lesbian candidate.

*The New Republic,* p. 15. And then on September 10, 1991, Mr. Lane revisited the issue, this time writing in *New York Newsday:*

The districting deliberations were not only a battleground for racial and ethnic turf wars, but an illustration of a national trend that has accelerated as states redraw political lines to account for the 1990 Census: The Voting Rights Act, once instrumental in overthrowing political apartheid in the South, is becoming a tool in the racial balkanization of American politics.

\* \* \* \* \* \*

In effect, the federal legal system is imposing proportional representation, enshrining the notion that each racial group in America has a right to a quota of seats in government.

\* \* \* \* \* \*

Concentrating voters by race also increases the likelihood that candidates of all races will appeal only to members of their own group, thus fostering extremism—and reducing the possibilities for multiracial coalitions. Instead of "empowering" minorities, the emerging system may weaken them, by confining their influence to a single area rather than permitting them to function as a "swing" vote in several districts.

\* \* \* \* \* \*

At least one key civil rights leader, John Jacob, executive director of the National Urban League, believes it is time to reassess federal voting rights policies.

"We have to ask if this isn't a new form of political apartheid—assuring some safe congressional seats for blacks at the cost of losing influence with legislators from adjoining districts," he told the group's annual conference in Atlanta last July. "Strategies that made sense when we just got the vote may not be the best strategies for leveraging our influence on issues that require broad legislative coalitions."

*New York Newsday,* pp. 40, 78.

Ms. Thernstrom, writing about legislative redistricting in the *Washington Post* on September 23, 1991, states:

Does fair representation demand such a system of reserved seats for separate castes? Only if America is a caste society composed (in effect) of separate nations defined by race and ethnicity.

\* \* \* \* \* \*

It is a vision of America deeply at odds with that upon which the civil rights revolution was built. Justice Department policy ... represents a sad betrayal of what the civil rights movement should stand for—a commitment to an integrated society, a society in which the horizons of trust extend beyond our racial and ethnic groups, a society in which the ties that bind us reach across racial lines.

\* \* \* \* \* \*

Dunne [the Assistant Attorney General for civil rights in the Justice Department] argues that in insisting on legislative quotas—race-based gerrymandering to protect black candidates from white competition—he is only enforcing the law. But Congress never envisioned the 1965 Voting Rights Act as an instrument for apartheid. Neither the original act nor its subsequent amendments were supposed to force jurisdictions to create a Jim Crow system of elections—districts of whites and districts for blacks. Dunne [the Assistant Attorney General for Civil Rights in the Justice Department] is rewriting the law to conform to black separatist notions that can only work to harden the racial and ethnic lines that already divide us.

Race may still have much to do with the way people vote. Often too much. But we build the expectation of racial separation into our basic political structure at our peril. Reality is not perfect, but our principles should remain so. We need electoral arrangements that deliver the right messages.

And the right messages are: that we are all Americans, that we're in this togeth-

er, that the government thinks of us and treats us as individual citizens with individual (not group) rights, that whites can represent blacks and blacks can represent whites, that we have no need for legislative quotas since distinct racial and ethnic groups are not nations in our society and that race does not and should not define the content of our character, political or otherwise.

The message that we deliver in our public policies are [sic] important. They help to shape the society. And the messages I urge square with the intent and language of the law.

*Washington Post,* p. A.11.

It is unfortunately true that there is a dearth of legal scholarship in this area. But at least some social and political scientists and astute journalist-reporters have been observant enough, and sensitive enough, to note what we are about here. We do not hesitate to cite their observations in what, after all, is an area—political life—where all, and none, are experts.

The idea that race or ethnicity, or language, or religion might become the basis for distributing voters during the periodic redistricting processes runs counter to our professed belief in the "oneness" of American political life and to the belief in Democracy itself with its emphasis on the individual citizen. There is no one coherent political philosophy, political principle or political program subsumed under such group labels as "black citizens," "white citizens," "Asian citizens," or "Hispanic citizens."[6] Historically we Americans have opted to pursue the ideal of equal political opportunity for each individual citizen. The standard is "one person, one vote." When we speak in terms of "group political rights" for such categories of voters we are immediately in deep water, for so much of real political significance may be hidden under such group labels. Do we not denigrate the importance of the individual, and that individual's independent, complex, political views, when we, on the basis of skin color

alone, casually lump him or her into some "cohesive" group during the redistricting process? As Ms. Thernstrom observed in the article on redistricting in the *Washington Post* on September 9, 1991, *supra,* the policy of the civil rights division of the Department of Justice requiring districting plans to provide the maximum number of safe black legislative seats,

> ... violates basic democratic premises about the fluidity of the categories into which voters put themselves—the different emphases they place on their racial, ethnic, religious, class, gender and other identities. Individual citizens in our society are supposed to choose how they think of themselves, and those choices will often vary from election to election. Depending on the issues, in one election I may think of myself primarily as a female voter and in another as a surburbanite. In pasting racial and ethnic labels on voters and assuming that only racial identity counts for purposes of districting and other electoral arrangements, the Department of Justice substitutes a rigid system of group rights for that of individual representation.

*Washington Post,* p. A.11.

The only political unit in our democracy that has any consistent coherency or integrity is the individual citizen voter.

In redistricting cases we seek to determine if there has been any denial or abridgement of the "right to vote" of "any citizen of the United States." Groups, whether racial, ethnic, language or religious, do not have the right to vote. But, although sad, it is nevertheless true that individuals, solely because of their identification with some racial, ethnic or religious group, are still discriminated against in this country. But how does one deal with this problem in the political arena? Is it by segregating and isolating such groups as was ordered in *Jeffers* and as is being sought here?[7]

The majority in *Jeffers* stated:

---

6. This is not to deny the values of cultural, ethnic and language traditions *within* the oneness of our political and economic lives. On the contrary, *E Pluribus Unum.*

7. To help put the issues here in proper perspective we ask: would an act of a state legislature

White voters, in short, can elect white candidates against black opposition, but black voters cannot elect black candidates against white opposition, with insignificant exceptions. We hope the day will come when this is no longer true, when voters of both races will vote for the person and not for the color of his or her skin.

730 F.Supp. at 209. We share this hope, but we believe the ruling and the remedy of the Court in *Jeffers* will substantially delay, and perhaps even prevent, the realization of that hope.

The only justification for using race, or ethnicity or language as a basis of political segregation is that the law requires it. And when does the law require it? This opinion will attempt to answer that question.

## IV. A TOUCH OF POLITICAL REALITY

Under current realities the "black influence district" which plaintiffs seek here will not be a "safe black district" but; it will be a "safe Democratic Party district." And yet no one has intervened in this case to oppose this result on behalf of the Republicans (black and white) in the proposed Fourth District. Indeed, the Republican Party is here identifying itself with the black plaintiffs' interest. The unspoken assumption is that the Republicans in the

proposed Fourth District will sacrifice their own political interest (wresting this seat from Democratic control) in favor of the larger objective of the Republican Party, i.e., to gain strength in the other two implicated congressional districts.[8] But we do not really know what the Republicans (black or white) in the proposed Fourth District think about plaintiffs' plan any more than we know what the blacks in the First and Second District think about it. Why? Perhaps because neither group is really aware of, or understands, this proposal. And they may not reach such an understanding unless and until that plan is placed into effect by this Court. Such is one of the dynamics of these redistricting cases. The adversarial system does not work too well in this type of litigation because of the absence of adequate notice to affected parties and also because of the mixed motives and interests of the actual parties and the sponsors of such litigation.[9] As stated by Ms. Thernstrom:

> Republicans have an additional reason for overlooking racial gerrymandering that benefits black candidates: what is good for black candidates is often good for Republicans. As blacks are drained from white districts, the latter become fertile ground for conservative candidates. In Jefferson County, Alabama, an out-of-court settlement in 1985 replaced an at-large system—under which

---

which *required* the apportioning authority to create as many black and language super-majority districts as possible, and then to pack the remaining black and language minorities in as many "superminority" districts as possible, withstand a federal constitutional attack? See discussion below under Section VI, *Intentional Racial Discrimination.*

**8.** More idealistically it must also be acknowledged that the Republican Party in Arkansas, by finding common cause with black supporters of this "black influence" district, is, in the best of political traditions, attempting to convert black Democrats to the Republican Party.

**9.** Another illustration of this non-partisan political phenomenon may possibly be found in the decision of the defendant Democratic office holders (constituting the State Board of Apportionment) to abandon in favor of the successful black plaintiffs the "preclearance" issues on appeal to the U.S. Supreme Court in the *Jeffers* case thereby depriving the people of Arkansas and the Arkansas General Assembly of the opportunity for a definitive ruling on the legality and constitutionality of the Court's chilling holding "that any further statutes, ordinances, regulations, practices or standards imposing or related to a majority-vote requirement in general elections in this State must be subjected to the preclearance process." *Jeffers,* 740 F.Supp. at 601. The defendants' concession might well make sense to a sensitive, concerned and accountable politician. But who is there to stand for the vindication of the right of people of Arkansas to decide when and if to impose a majority-vote requirement in its general elections without having to seek the permission of a federal court? The failure of the defendants to pursue the appeal has left a permanent cloud over the state's right to extend the principle of majority rule.

only whites had been elected—with five single-member districts. Two safe black districts were created, leaving three that were almost completely white, and the Republicans benefited from the change. Unless unopposed, Democrats could not win in districts that contained few blacks, and in 1986 two Democratic incumbents lost.

The Jefferson County story was not unique. As a consequence of a compromise reached by South Carolina and the Department of Justice (joined by the NAACP), the state increased the proportion of black voters in two senatorial districts. In the 1984 election, in four districts from which blacks had been drained, conservative Republicans replaced incumbent liberal Democrats. In *Gingles,* the North Carolina case, state Republican leaders openly acknowledged the "happy coincidence" between the interests of blacks and Republicans. Indeed, they had much to celebrate. Following the district court decision, the North Carolina general assembly created thirty-one single-member districts out of eight that had been multimember. In 1984 the new districting helped Republicans double their share of state legislative seats. Ironically, it was the Democrats—usually quick to charge the Republicans with lax civil rights administration—who were unhappy. Safe black districts, they said, isolate black voters and deprive liberal white Democrats of crucial black support.

Thernstrom at 234.

All of which would be irrelevant if the plaintiffs and intervenors would be entitled, upon proof of the facts alleged in their Complaints, to the relief sought. In other words, if, under the Voting Rights Act or the Constitution, the plaintiffs and intervenors in this case were entitled to the relief they are seeking, the negative consequences that would follow from that result would not constitute a basis for the denial of such relief. But this overview is important because plaintiffs and the black intervenors contend this result is what the Congress mandated and intended when it amended Section 2. They also contend that the Fourteenth and Fifteenth Amendments to the Constitution require the creation of such an "influence" district upon proof of the facts alleged in their Complaints. Certainly the consequences of such interpretations must be weighed in assessing the merit and reasonableness thereof.

## V. VOTING RIGHTS ACT CLAIM

Plaintiffs claim that the reapportionment plan violates Section 2 of the Voting Rights Act, 42 U.S.C. Sec. 1973, as amended in 1982. The basis of plaintiffs' claim is that the new congressional district boundaries "dilute black voting strength ... with the effect ... of giving the black citizens of this state less opportunity than other members of the electorate to elect representatives of their choice." [10] Complaint at 10.

This case raises, *inter alia,* an issue similar to the one reserved by the Supreme Court in the seminal case analyzing the 1982 amendments to Section 2, *Thornburg v. Gingles,* 478 U.S. 30, 46 n. 12, 106 S.Ct. 2752, 2764 n. 12, 92 L.Ed.2d 25 (1986), to

---

**10.** The Complaint in effect alleges that the redistricting plan established by Act 1220 of 1991 affects adversely the group rights of "the black citizens of this state." This is a statewide attack on the redistricting plan rather than a district by district attack. Black plaintiffs residing in the non-"influence" districts (the First and Second Districts) are not complaining about the loss of black influence in their districts which would result if plaintiffs' plan were adopted. And no other contrary thinking black residents from those "non-beneficiary" districts have asked to intervene. In any event the challenges being made here are not "district-specific". *Thornburg* discusses this problem as does the dissent in *Jeffers.* See *Jeffers,* 730 F.Supp. at

241–243, 249–250, 265–266 (Eisele, C.J., dissenting). Plaintiffs' theory appears to be that black citizens *statewide* constitute a politically cohesive group and share a common interest in creating one district with the maximum numbers of black voters possible and that black voters "left behind" in the other districts where their numbers would be greatly reduced would simply not complain about the dilution of their influence i.e. those black voters "wasted" (to employ the terminology used by New York City Redistricting Commission) or "left behind" would under this theory be deemed to have willingly sacrificed their personal political self-interest in order to achieve the perceived larger group goal.

wit: whether a minority group that is *not* sufficiently large and compact to constitute a majority in a single-member district has a lawful claim under Section 2 for the creation of a "superminority" district as prayed for in the Complaint. This Court concludes that, under the undisputed facts and circumstances of this case, plaintiffs and plaintiff-intervenors have no actionable claim for such relief.

### A. Section 2 and the "Preconditions" of Thornburg v. Gingles

Before its amendment in 1982, Section 2 of the Voting Rights Act of 1965 provided:

No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right to any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title.

42 U.S.C. § 1973 (1981). As a result of the 1982 amendment, Section 2 now reads as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(s) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elect-

ed to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973 (1991 Supp.) (Emphasis in original).

The 1982 amendment rejected the position of the plurality opinion in *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), which held that the 1965 Voting Rights Act required a showing that the contested electoral practice was adopted with the *intent* to discriminate against minority voters. The 1982 amendment replaced the "intent" test with an earlier test, from *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), focusing on the *impact, result,* or *effect* of the contested structure or practice on minority electoral opportunities. So proof of an intent to discriminate under the current version of Section 2 is not required. Indeed, under a literal reading of the current version of Section 2, if there is present an intent to discriminate which does not *result* in any discrimination, or have any discriminatory effect, the statute would not appear to come into play because, simply, that intent would not "result in the denial or abridgment" of anyone's rights. As stated by Justice Scalia in his dissent in *Chisom v. Roemer,* —— U.S. ——, 111 S.Ct. 2354, 2369–70, 115 L.Ed.2d 348 (1991):

As currently written, the statute proscribes intentional discrimination only if it has a discriminatory effect, but proscribes practices with discriminatory effect whether or not intentional.

Before analyzing a case under Section 2 it is important to take a "walk through that statute" as was done in *Jeffers.* Although we believe the meaning and interpretation of Section 2 as applied to this case is clear, we recognize the convoluted grammatical arrangement thereof requires the reader to carefully follow the succession of phrases by which the statute reinterprets itself.

Subsection (b) of Section 2 makes it clear that the operative provisions of Section 2

are contained in subsection (a). In other words, the question always is whether the challenged standard, practice or procedure ... violates subsection (a). We know this because subsection (b) merely refers back to subsection (a) by use of the following introductory language: "A violation of subsection (a) is established if...." So the basic question which courts are asked to answer in applying Section 2 is whether the [standard, practice or procedure] is being imposed or applied "in a manner which results in a denial or abridgement of the right to any citizen ... to vote on account of race ..." If it is decided that the challenged [standard, practice or procedure] does not result in a *denial* of the right of any citizen to vote on account of race, then the court must determine whether that [standard, practice or procedure] results in an *"abridgement* of the right of any citizen to vote on account of race." In this context, it is assumed that "abridge" would mean to curtail, limit, or burden. In any event, we are dealing with *the right to vote,* either its denial or its curtailment or limitation.

As pointed out above, subsection (b) of Section 2 identifies what is necessary to establish a violation of subsection (a). Of course, it is assumed that there should be some logical nexus between the showing identified in subsection (b) and the "denial or abridgement" language of subsection (a). According to subsection (b), a denial or abridgement of the right to vote "is established if ... it is shown that the political processes leading to nomination or election ... are not equally open to participation by members of ..." a protected class.

It is easy to determine whether a [standard, practice or procedure] *denies* any citizen the right to vote. If not, subsection (b)

states that a showing that the "political processes" are not "equally open to participation," because of the challenged [standard, practice or procedure], would nevertheless be adequate to establish that the [standard, practice or procedure] *abridged* the right to vote. So we look at the [standard, practice or procedure] and determine if it has resulted in the political process "not being equally open to participation" by black citizens. If it did not have that effect, then, logically, one would conclude no violation.

But subsection (b) of Section 2 has another phrase that must be dealt with. It, in effect, states that a showing can be made that the challenged [standard, practice or procedure] has caused the political process "not to be equally open to participation" by black citizens if it can be shown that such black citizens "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."

So, if the challenged [standard, practice or procedure] does not cause black citizens to "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice," then it cannot be found that such [standard, practice or procedure] causes the political processes "not to be equally open to participation" by black citizens and, therefore, finally, there would be no violation of the operative language in subsection (a), i.e., the "abridgement of the right of any citizen ... to vote on account of race." [11]

Absent a showing that the challenged [standard, practice or procedure] resulted in the *denial* of a citizen's right to vote, the first inquiry, then, will be whether that [standard, practice or procedure] caused

---

**11.** It can be argued that "less opportunity to elect representatives of their choice" is essentially surplusage, because, if the political process is as "equally open to participation" by blacks as it is to everyone else, and if blacks do not have "less opportunity to participate in the political process" than other members of the electorate, then it would follow that blacks would have the same "opportunity to elect representatives of their choice" as everyone else. However, the "opportunity to elect" language draws the

court's attention to the possible breakdown in the system that can occur when there is racially polarized block voting.

The need to prove that the challenged practice results in blacks having *both* (a) less opportunity to participate in the political process, *and* (b) less opportunity to elect representatives of their choice is discussed below under Section V.C, p. 46, and in *Chisom v. Roemer,* —— U.S. ——, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991).

blacks to have "less opportunity than other members of the electorate to participate in the political processes and to elect representatives of their choice." *Jeffers*, 730 F.Supp. at 229–30 (Eisele, C.J., dissenting).

■ Since it is the 1991 redistricting decision of the Arkansas Legislature which is being challenged here, the first phrase of Section 2(a), [to wit, "No voting qualification or prerequisite to voting,"] is not implicated. Such a legislative redistricting plan, and any Section 2 challenge thereto, must therefore fall under the rubric of "standard, practice or procedure." In the context of this case, the stated purpose of Section 2 is to prohibit states and other political subdivisions from imposing any "standard, practice or procedure" which results in black citizens having less opportunity than others to participate in the political process and to elect representatives of their choice. It is the "opportunity" of blacks "to participate" and "to elect" to the same extent as other members of the electorate that may not be denied or abridged by any state created or applied barrier.

■ In *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the Supreme Court interpreted the 1982 amendments to the Voting Rights Act. It enumerated several "objective factors" which a court should consider when analyzing the "impact" of the challenged state practice. Those factors, listed in the Senate Report to the 1982 amendment, are often called the "Senate factors" or the "Zimmer factors," since they were first mentioned in *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir.1973) (enumerating factors to be used in evaluating the totality of the circumstances).[12] *See generally, Gingles*, 478 U.S. at 43–45, 106 S.Ct. at 2762–2763.

However, the Supreme Court went one step further and imposed its own threshold preconditions for certain claims under Section 2:

While many or all of the factors listed in the Senate Report may be relevant to a claim of vote dilution through submergence in multimember districts, unless there is a conjunction of the following circumstances, the use of multimember districts generally will not impede the ability of minority voters to elect representatives of their choice. Stated succinctly, a block voting majority must *usually* be able to defeat candidates supported by a politically cohesive, geographically insular minority group. These circumstances are necessary preconditions for multimember districts to operate to impair minority voters' ability to elect representatives of their choice for the following reasons. First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. If it is not, as would be the case in a substantially integrated district, the *multi-member form* of the district cannot be responsible for minority voters' inability to elect its candidates. Second, the minority group must be able to show that it is politically cohesive. If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests. Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Gingles*, 478 U.S. at 48–51, 106 S.Ct. at 2765–2767 (citations omitted). (Emphasis in original).

The Supreme Court specifically reserved, in the context of challenges to multi-member districts, a question similar to the one at issue in the instant case. The relevant footnote to *Gingles* states: "[W]e have no occasion to consider whether sec. 2 permits, and if it does, what standards should per-

---

**12.** A lengthy discussion of these factors and their confusing and oft times misleading role in evaluating Section 2 claims will be found in the *Jeffers* dissent, 730 F.Supp. at pp. 231–232 and 252–262.

tain to, a claim brought by a minority group that is not sufficiently large and compact to constitute a majority in a single-member district, alleging that the use of a multimember district impairs its ability *to influence* elections...." *Gingles*, 478 U.S. at 46 n. 12, 106 S.Ct. at 2764. Here we are not dealing with an allegation that the use of *multimember districts* impairs the minority's ability to influence elections. But the same or similar arguments can be made in the context of forming single member districts.

To prevail plaintiffs must convince the Court that the *Gingles* preconditions to a Section 2 claim should not apply where, as here, it is impossible to meet one or more of those conditions.[13] Clearly they are contending that the black plaintiffs and intervenors should not be required to meet the condition that they show they could constitute a majority in a redesigned district. Do they claim that they need not meet the other two preconditions? Apparently not, because they allege that they can establish these preconditions.

Lower federal court cases subsequent to *Gingles* hold that the preconditions engrafted onto the statute by the Supreme Court in *Gingles* apply to claims where the minority voters challenge the alleged gerrymandering of *single-member* voting districts such as those at issue here. See *Jeffers v. Clinton*, 730 F.Supp. 196 (E.D.Ark.1989), which was also a statewide redistricting challenge. And this part of the *Jeffers* decision was affirmed by the U.S. Supreme Court, 111 S.Ct. 662 (1991).

The principal case relied upon by plaintiffs and the Walker intervenors to sustain their "influence district" contention is *Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir.1990). The plaintiffs there conceded that in 1981, when the district lines were drawn, it was not possible to create a majority Hispanic district. However, at the time the suit was filed in 1988, and when relief was granted, it was possible to create such a district. That, of course, is not the situation here. Here it was impossible to create a majority black Congressional district in 1981, and it is impossible now in 1991 to create such a district.

The *Garza* Court handles the "majority population" precondition of *Gingles* as follows:

> In this appeal, the County's threshold argument is that districts drawn in 1981 are lawful, regardless of any intentional or unintentional dilution of minority voting strength, because at the time they were drawn there could be no single-member district with a majority of minority voters. The County asks us to extract from the Supreme Court's leading decision in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), and subsequent cases in this and other circuits, the principle that there can be no successful challenge to a districting system unless the minority challenging that system can show that it could, at the time of districting, constitute a voter majority in a single-member district.

> In response to this position, the appellees argue that no majority requirement should be imposed where, as here, there has been intentional dilution of minority voting strength. The County thus also challenges the sufficiency of the district court's findings with regard to intent.

> We hold that, to the extent that *Gingles* does require a majority showing, it does so only in a case where there has been no proof of intentional dilution of minority voting strength. We affirm the district

---

**13.** The Court is inclined to agree with the plaintiffs and the Walker intervenors that all of the *Gingles* court-created preconditions might not be required in every conceivable redistricting challenge under Section 2. First of all the statute does not mention those preconditions. (Although one of the "Senate Factors" does refer to "the extent to which voting in the elections of the State or political subdivision is racially polarized.") Those preconditions were judicially created in order to make the statute make sense in a case challenging multi-member districts. Those preconditions are now required in all run-of-the-mill redistricting cases. But *Gingles* itself clearly recognized that each different challenge must be analyzed anew under the provisions of Section 2. Nevertheless the facts of this case, precedent, and especially *Jeffers*, require adherence to such pre-conditions here.

court on the basis of its holding that the County engaged in intentional discrimination at the time the challenged districts were drawn. *Garza*, 918 F.2d at 769. But Section 2 does not speak in terms of intent and *Gingles* nowhere alludes to this distinction. Furthermore, the *Gingles* rationale would not support this dichotomy. Even the *Garza* majority acknowledges the need to show a discriminatory effect:

> Even where there has been a showing of intentional discrimination, plaintiffs must show that they have been injured as a result. Although the showing of injury in cases involving discriminatory intent need not be as rigorous as in effects cases, *some* showing of injury must be made to assure that the district court can impose a meaningful remedy.

*Id.* at 771. This is a mild but important concession since Section 2, as now written, speaks only of results and makes no distinction between the intentional and unintentional causes thereof.

The Court here also relies on two appellate decisions from other circuits. In *Brewer v. Ham*, 876 F.2d 448 (5th Cir. 1989), the Fifth Circuit denied relief in a voting rights challenge to an at-large election system for Killeen Independent School District in Texas. Plaintiffs' failure to show that a politically cohesive minority group could form a majority of the voters in a single-member district was dispositive of their voting-rights claim. *Id.* at 453. The *Brewer* court, relying on *Gingles*, specifically rejected the voting rights claim even though a black minority candidate might win a multi-candidate plurality election in a single-member district. *Brewer*, 876 F.2d at 454–55.

In *McNeil v. Springfield Park District*, 851 F.2d 937 (7th Cir.1988), the Seventh Circuit directly addressed the question before this Court. There the members of the Springfield Park District Board and Springfield School Board, each consisting of seven members, were elected at large. Plaintiffs, black voters, challenged the multi-district system, asking the court to divide the districts into seven single-member districts. The U.S. District Court granted summary judgment for the defendants holding that the plaintiffs failed to satisfy the necessary "preconditions" established by the Supreme Court in *Gingles*, and, more particularly, the requirement that the plaintiffs show that black voters constituted a "sufficiently large and geographically compact [group] to constitute a majority in a single-member district." [14]

On appeal the black appellants argued that they should be permitted to show that the multi-district plan impaired their ability *to influence* elections even though they could not show that the scheme impaired their ability *to elect* candidates of their choice. The *McNeil* Court addressed this argument as follows:

> Appellants finally argue that, although the application of *Gingles* may warrant summary judgment on the claim that the multi-member districts impair their ability *to elect* their preferred candidates, they can prevail on a claim that the system impairs their ability to *influence* elections. Appellants rely on a distinction made briefly by the *Gingles* majority. *See* 106 S.Ct. at 2764 n. 12.

> \* \* \* \* \* \*

> We cannot accept the appellants' contention that they can avoid the *Gingles* criteria by arguing that the multi-member districts impair their ability to influence elections. Given the Court's decision to draw a bright line for summary judgment purposes, it seems counterproduc-

**14.** The factual situation is set out as follows: 2. The boundaries of the school district differ slightly from the park district. According to the 1980 census, the population of the park district was 119,334, of which 11,198 (or 9.4%) were black. The population of the school district was 122,997, of which 11,217 (or 9.1%) were black. The population of appellants' proposed single-member park district would be 50.4% black, but the voting age population would be only 43.7% black, according to 1980 census figures. Similarly, while the total population of the proposed single-member school district would be 50.2% black, the voting age population would be 43.2% black. *McNeil*, 851 F.2d at 939.

tive to permit plaintiffs who cannot satisfy the threshold *Gingles* tests to make alternative claims that would obliterate the bright line. If allowed, the "ability to influence" claim would severely undermine whatever good purpose is served by the threshold factors.

Courts might be flooded by the most marginal Section 2 claims if plaintiffs had to show only that an electoral practice or procedure weakened their ability to influence elections. While Congress intended to make it easier for minorities to show that their vote has been diluted, it presumably did not intend to require courts to entertain claims by a tiny segment of a multi-member district's population that the group's inescapably minimal influence has been impaired by the electoral arrangements. In view of the Court's apparent objective of sharpening section 2's [sic] focus, we cannot consider claims that multi-member districts merely impair plaintiffs' ability to influence elections. Plaintiffs' ability to win elections must also be impaired.

*McNeil,* 851 F.2d at 947.

The Court also rejects plaintiffs' contention that *McNeil* should not apply to this case because it involved multi-member districts. On the contrary, the statements of the *McNeil* court apply even more aptly to the single-member districts in question here.

The majority opinion in *Gingles* succinctly states why a showing of "ability to constitute a majority" is a prerequisite to a Section 2 claim:

The reason that a minority group making such a challenge must show, as a threshold matter, that it is sufficiently large and geographically compact to constitute a majority in a single-member district is this: Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice. The single-member district is generally the appropriate standard against which to measure minority group potential to elect because it is the small-

est political unit from which representatives are elected. Thus, if the minority group is spread evenly throughout a multimember district, or if, although geographically compact, the minority group is so small in relation to the surrounding white population that it could not constitute a majority in a single-member district, these minority voters cannot maintain that they would have been able to elect representatives of their choice in the absence of the multimember electoral structure....

*Gingles,* 478 U.S. at 50 n. 17, 106 S.Ct. at 2766 n. 17. (Emphasis in original).

In the language of *Gingles,* even "in the absence of the challenged structure or practice" (here the district lines created by Act 1220 of 1991), it cannot be shown that it is possible to create a "sufficiently large and geographically compact district" in which black voters could constitute a majority.

■ The claim for a "superminority" district must also fail because, *inter alia,* of the implications arising out of the third part of the 3–part test outlined in *Gingles.* In order to establish a Section 2 claim, plaintiffs must show that the white majority votes sufficiently as a block to enable it usually to defeat the minority's preferred candidate. Were plaintiffs to establish this prong of the test, they would thereby effectively demonstrate that, *because of this polarized voting,* they would *not* be able to influence the outcome of an election in their proposed district. So plaintiffs are asking the Court to fashion a "remedy" which would pack black voters into a single district where, by hypothesis, they could not elect a representative of their own choosing, while fracturing and reducing the number of blacks in adjacent districts.

But plaintiffs argue here, contrary to the position of the plaintiffs in *Jeffers,* that if the percentage of black voters in District Four is increased from 27 percent (as it is under Act 1220 of 1991) to 38 percent (as it would be under plaintiffs' proposal), it will be easier for black voters to "elect representatives of their choice" by forming coali-

tions with white voters.[15] Their argument not only ignores the need to prove under *Gingles* that polarized voting prevents this from happening, but it directly undercuts their Section 2 claim by showing that even absent a majority, they could elect candidates of their choice if they sought alliances and coalitions with other voters in the traditional political manner. If this is true there is no need for, or legal basis for, a Section 2 claim. As Justice O'Connor put it in her *Gingles* concurrence:

> ... [I]f a minority group that is not large enough to constitute a voting majority in a single-member district can show that white support would probably be forthcoming in some such district to an extent that would enable the election of the candidates its members prefer, that minority group would appear to have demonstrated that, at least under this measure of its voting strength, it would be able to elect some candidates of its choice.

*Gingles*, 478 U.S. at 89 n. 1, 106 S.Ct. at 2787 n. 1 (O'Connor, J., concurring).

The requirement of a showing of "racially polarized voting" itself acts as a limit on the percentage of black citizens that may be "packed" into a district. In the case of an area where there is racially polarized voting, the more black voters that are packed into a single legislative district, *short of a majority*, the less the black voting power or influence in the state as a whole. So if plaintiffs were able to establish the last two enumerated *Gingles* preconditions, they would thereby also establish that one cannot create an "influence" district by packing less than a majority voting age population into that district.

What if the legislature had enacted plaintiffs' proposed redistricting plan and black citizens in the old First District sued alleging a violation of Section 2? The benchmark would be the 1982 *Doulin* redistricting plan. In that plan, the black voting populations in the three implicated districts were:

Black VAP (Doulin Plan)

| First | 15.6% |
| Second | 14.5% |
| Fourth | 24.6% |

Then by hypothesis the legislature enacts plaintiffs' proposed plan and the black voting population in the four districts changes to:

Plaintiffs' 1991 Proposal

| First | 6.2% |
| Second | 13.5% |
| Fourth | 38% |

So whereas Act 1220 of 1991 would change the proportion of black voters to white voters only marginally in the four Congressional districts, plaintiffs' plan would dramatically dilute black voting power particularly in the First District. Therefore, if the legislature had enacted plaintiffs' proposed plan and black voters objected thereto, would not those objecting have a "lay down hand" under Section 2?

Strangely, the answer under Section 2 is probably not.[16] And this is so not only because of plaintiffs' inability to satisfy the "majority" requirement of the first *Gingles* precondition. It would also follow if the *Jeffers* majority is correct in holding that "less opportunity to elect representatives of their choice" means "less opportunity to elect *black* representatives of their choice," because that holding independently implies the need for a majority black voting age population.[17]

---

**15.** It is interesting to note that the remedy ordered in *Jeffers* actually destroyed such "influence" districts. In order to pack enough voting age blacks into certain districts to obtain supermajorities in excess of 60% it was necessary to greatly reduce the number of blacks in adjacent districts. Dramatically, old House District 85 was reduced from 38% black voting age population (VAP) to 27% black VAP whereas here the plaintiffs and black intervenors seek to take a 27% black VAP district and increase it to 38%! And House District 77 in *Jeffers* was reduced from 42% black VAP to a 20% black VAP. Other examples abound. See discussion in *Jeffers*, 730 F.Supp. at 248–49.

**16.** But probably yes under the Fourteenth and Fifteenth Amendment if a discriminatory intent could be established. This is because the constitutional claims are not burdened by the language of Section 2.

**17.** But see *Armour v. Ohio*, 775 F.Supp. 1044 (N.D.Ohio 1991), a three judge district court case decided September 4, 1991, in which black plaintiffs were also seeking an "influence" dis-

The language of Section 2, the rationale of *Gingles* and *Jeffers,* and precedent control the disposition of defendants' combined Motion to Dismiss/Motion for Summary Judgment with respect to the cause of action plaintiffs attempt to assert under the Voting Rights Act.

### B. Is Section 2 an Affirmative Action Statute?

■ But there is another more fundamental issue confronting the Court in this case and in *Armour.* In *Armour,* as here, the redistricting act under attack did not change in any significant way the population alignments that existed immediately prior to its implementation. So the funda- mental issue arises: Is Section 2 an affirmative action statute at the liability stage?

How do the black plaintiffs and the black Walker intervenors contend that Act 1220 results in black voters having less opportunity to participate or to elect? "Less" assumes some benchmark. Less than what?

The plaintiffs' Complaint states that "the *1980* redistricting plan and the proposed [Act 1220] plan fractured black population between the First, Second and Fourth Congressional Districts." Complaint, paragraph 24. They allege that Act 1220 was designed "to dilute black voting strength in the First, Second and Fourth Congressional Districts" and that it "fractured the black population ... into three different congres-

---

trict since they could not constitute a majority in a single district. The majority held for the plaintiffs and in so doing reached the opposite position from *Jeffers* on this important issue. Note the following language from *Armour:*

> The next question that we address is whether black voters could elect a candidate of their choice in a redrawn district.
> For the reasons set forth below, we find that plaintiffs have shown that in the proposed district they will be able to elect a candidate of their choosing.
> Defendants go to great lengths to demonstrate that based upon racial voting patterns plaintiffs will not be able to elect a black candidate without a majority of black voters in the redrawn district. However, defendants misapprehend the requirements of the Voting Rights Act. The issue is not whether the plaintiffs can elect a black candidate, but rather whether they can elect a *candidate of their choice.* We believe that they can. In a reconfigured district, plaintiffs will constitute nearly one-third of the voting age population and about half of the usual Democratic vote. Therefore, the Democratic Party and its candidates will be forced to be sensitive to the minority population by virtue of that population's size. Moreover, in a district composed only of Youngstown and Campbell, candidates and representatives will not find themselves in conflict between the interests of wealthy suburbs and the impoverished urban communities they serve, since black voters consistently vote eighty to ninety percent Democratic and white voters vote consistently almost fifty percent Democratic, we find that plaintiffs could elect a candidate of their choice, although not necessarily of their race, in a reconfigured district.[20]

[20] The State of Ohio argues that the plaintiffs' claim of an ability to elect based on an alleged correlation between the outcome of the democratic primary election and victory in the general election is flawed. We agree. Plaintiffs contend that in a redrawn district they will be able to elect a black candidate in the Democratic primary by a plurality and, because the democratic candidate always wins the general election, they will therefore be able to elect a black candidate to office. The problem with this reasoning is that plaintiffs have demonstrated persuasively that white voters in Mahoning County do not usually vote for black candidates. Thus, there is no assurance that a black candidate winning the primary could muster sufficient white votes to be elected to office. However, our conclusion that blacks in a redrawn district could elect a candidate of their choice depends neither upon an historical correlation between the outcome of the primary and the general election nor upon speculation as to how a *black* can be elected, and therefore the inconsistency in plaintiffs' theory does not affect our conclusion.

*Armour,* 775 F.Supp. at 1059–60 (footnote omitted). (Emphasis in original.)

This court must follow *Jeffers* on this issue, but it is interesting to note what we have here. In *Jeffers* the majority uses the "opportunity to elect *black* representatives" test in order to establish a predicate for granting relief, and in *Armour* the Court adopts the opposite interpretation as a predicate for giving relief.

We do not understand the plaintiffs to contend that the white representatives actually elected to Congress in the First and Fourth Congressional Districts over the past decade have not been the choice of the overwhelming majority of the black voters in those districts. Plaintiffs, following *Jeffers,* contend they should be able to elect "black representatives of their choice."

sional districts," Paragraph 28. More specifically plaintiffs allege:

> According to the 1990 census, the three most populous counties in terms of black population are Pulaski with 92,200 black residents; Jefferson with 36,877 black residents; and Crittenden with 21,401 black residents. The Defendants have placed these three counties in three different congressional districts under the Dowd/Harriman plan. Pulaski is in the Second District, Jefferson is in the Fourth District, and Crittenden is in the First District.

Plaintiffs' Complaint paragraph 32(a), p. 10. The Complaint of the Walker intervenors likewise alleges that Act 1220 "fragmented the African American population ... into three different congressional districts." Complaint in Intervention, paragraph 29. It further alleges that the boundaries created by Act 1220 "have the effect of diluting African American voting strength." Paragraph 46.

But the uncontested facts show that Act 1220 did not "fracture the black population into three different congressional districts." Rather it left those populations essentially undisturbed. Indeed, in their Brief, plaintiffs lament that the motivation of Act 1220 was "the preservation of the status quo." Plaintiffs' Brief, p. 17.

In their oral presentation during the first in-court conference in this case, plaintiffs suggested that the problem of fracturing the black vote goes back to the 1960's and maybe earlier. This is a recognition that in recent decades there have been no major changes in the black populations occasioned by the congressional redistricting process. Critical here, there was no significant change in 1991 from the plan adopted and approved by the Court in 1982.

So unless the legislature was obligated on the occasion of each redistricting to seek out ways and means to increase or enhance the influence of black voters, plaintiffs and the Walker intervenors must lose.

Some will say that the United States Supreme Court's actions in disposing of the *Jeffers* appeal constitute an approval *sub silentio* of the view that Section 2 is, indeed, an affirmative action statute requiring the states during any redistricting process to maximize the political effectiveness of black voters. But this can only be "judicial legislation," for Section 2 only prohibits the imposition or application of any standard, practice or procedure in a manner that results in black voters having less opportunity than others to participate in the political process or to elect representatives of their choice. "Less opportunity" by any fair interpretation means "less opportunity" than such black voters had immediately before the imposition or application of the challenged standard practice or procedure; [18] not "less opportunity" than they would have, had the legislature seized the opportunity to help them by maximizing their political influence.

It is the Court's opinion that Section 2, in the context of this case, is not an affirmative action statute. It seeks equal opportunity—not unequal opportunity. And even though affirmative action type *remedies* may be available (within constitutional limits) upon proof of a violation of the statute, that statute is not violated by a state legislature simply because that legislature does not enact a districting plan that maximizes black political power or influence. The legislature's plan, to trigger Section 2 relief, must first harm or dilute black political opportunity. If it does not, there is no violation and no predicate for potential draconian enhancement remedies such as we

---

**18.** Let us assume that during the 1960 redistricting black voters were fragmented or packed in a manner that resulted in their having less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. Then assume that the redistricting process in 1970, 1980 and 1990 simply continued the 1960 lines (to the extent possible under the one-person, one-vote principle). Can it be said under such circumstances that the 1990 lines result in black voters having less opportunity just as much as the 1960 lines? It defies logic to contend that it is the 1990 lines that have caused the problem because the problem, by hypothesis, would be the same whether redistricting occurred in 1990 or not. It cannot therefore be said that, but for the 1990 redistricting, black voters would have had the equal opportunity required by the law.

find in *Jeffers*.[19] So on this basis alone, plaintiffs and the Walker intervenors must lose on their Section 2 claim.

Justice Scalia in his dissent in *Chisom* recites established principles of statutory construction that so often are overlooked or ignored in dealing with the Voting Rights Act:

> Section 2 of the Voting Rights Act is not some all-purpose weapon for well-intentioned judges to wield as they please in the battle against discrimination. It is a statute. I thought we had adopted a regular method for interpreting the meaning of language in a statute: first, find the ordinary meaning of the language in its textual context; and second, using established canons of construction, ask whether there is any clear indication that some permissible meaning other than the ordinary one applies. If not— and especially if a good reason for the ordinary meaning appears plain—we apply that ordinary meaning.

*Chisom*, 111 S.Ct. at 2369 (Scalia, J., dissenting). He laments the approach that "begins not with what the statute says but with an expectation about what the statute must mean."

> As method, this is just backwards, and however much we may be attracted by the result it produces in a particular case, we should in every case resist it. Our job begins with a text that Congress has passed and the President has signed. We are to read the words of that text as any ordinary Member of Congress would have read them, see *Holmes, The Theory of Legal Interpretation*, 12 Harv.L.Rev. 417 (1899), and apply the meaning so determined.

*Id.* It is the failure to follow such wise counsel that has resulted in most of the confusion we find in the Section 2 cases.

## C. Another Barrier: The Dual Proof Requirement of Section 2

There is another threshold barrier to plaintiffs' claim here. This can best be identified by reference to a discussion in the *Jeffers* case. It will be recalled that the *Jeffers* Court was not unanimous in answering the following question:

> To make out a Section 2 violation, must plaintiffs prove both of the following: that, as a result of the 1981 district lines, blacks (1) have less opportunity to participate in the political processes; and (2) have less opportunity to elect representatives of their choice?

The majority was of the opinion it was not necessary to prove both. That opinion stated:

> Even if plaintiffs failed to show less opportunity to participate in the political process, a showing that they have less opportunity to elect candidates of their choice would suffice to establish their claim. The right protected is the aggregate of these opportunities—the right to effective participation in the political system ...

*Jeffers*, 730 F.Supp. at 204. The dissent disagreed. *Id.* at 231.

■ This argument has now apparently been resolved consistent with the minority's view in *Jeffers*.[20] In *Chisom v. Roemer*, —— U.S. ——, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991), the Supreme Court discusses and resolves the issue as follows:

> The *LULAC* majority assumed § 2 provides two distinct types of protection for minority voters—it protects their opportunity "to participate in the political process" and their opportunity "to elect representatives of their choice."
>
> *       *       *       *       *       *
>
> Any abridgment of the opportunity of members of a protected class to participate in the political process inevitably impairs their ability to influence the

---

**19.** This Court believes that such remedies are also limited by the Constitution but we need not explore those limits here.

**20.** A summary affirmance of a Three–Judge District Court by the U.S. Supreme Court is clearly of more precedential significance than a denial of certiorari. But the question is: how much more? The Supreme Court in *Chisom* reverses a critical holding in *Jeffers* without even citing that opinion. And *Jeffers* was affirmed less than a year before *Chisom* was decided.

outcome of an election. As the statute is written, however, the inability to elect representatives of their choice is not sufficient to establish a violation unless, under the totality of the circumstances, it can also be said that the members of the protected class have less opportunity to participate in the political process. The statute does not create two separate and distinct rights. Subsection (a) covers every application of a qualification, standard, practice, or procedure that results in a denial or abridgement of *"the right"* to vote. The singular form is also used in subsection (b) when referring to an injury to members of the protected class who have less "opportunity" than others "to participate in the political process *and* to elect representatives of their choice." 42 U.S.C. § 1973 (emphasis added). It would distort the plain meaning of the sentence to substitute the word "or" for the word "and." Such radical surgery would be required to separate the opportunity to participate from the opportunity to elect.

The statutory language is patterned after the language used by Justice White in his opinions for the Court in *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) and *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). See n. 22, *supra*. In both opinions, the Court identified the opportunity to participate and the opportunity to elect as inextricably linked. In *White v. Regester*, the Court described the connection as follows: "The plaintiffs' burden is to produce evidence ... that its members had less opportunity than did other ... residents to participate in the political processes *and* to elect legislators of their choice." 403 U.S. at 149, 91 S.Ct. at 1872 (emphasis added).

The results test mandated by the 1982 amendment is applicable to all claims arising under § 2.

*Chisom*, 111 S.Ct. at 2364–65.

The point is important to make because the majority in *Jeffers* appears to have conceded that plaintiffs there could not show that the state-legislature redistricting plan at issue resulted in blacks having less opportunity to participate in the political process than others in the electorate. Note the language of the majority's opinion in *Jeffers:*

... We further find that voting in the areas of the State in question is markedly polarized by race. Both black and white voters usually prefer candidates of their own race. Black voters are far from powerless. They exercise significant, sometimes decisive influence. But they can elect a candidate of their choice, in a district in which the voting-age population is majority white, only if that candidate is white. For the foreseeable future, the present location of legislative district lines will make it very difficult to elect more than six black legislators, out of a total in both houses of 135 members. And this is so even though black people make up about 16 percent of the total population of the State of Arkansas.

In this situation, *black citizens have less opportunity* than other members of the electorate *to elect representatives of their choice.* This is a violation of Section 2(b) of the Voting Rights Act, 42 U.S.C. § 1973(b). For reasons we shall explain in this opinion, Plaintiffs have proved a violation of the law in all of the areas of the State called in question by this suit, except for Pulaski County. (Emphasis supplied).

730 F.Supp. at 198.

It is assumed that if no such showing (i.e. that the district lines resulted in blacks having less opportunity to participate in the political process) could be made in that case, then, *a fortiori*, it could not be made here. Therefore, if proof of both such elements is required as a matter of law, then under that assumption plaintiffs would fail here in any event.

■ The Court notes the following language of the plaintiffs' Complaint:

The Voting Rights Act has been violated by the Defendants for the reason that the congressional district boundaries

have been drawn to dilute black voting strength and has the effect or result of giving the black citizens of this State less opportunity than other members of the electorate to elect representatives of their choice.

Complaint at 10. So we see that plaintiffs here do not even contend that the congressional district lines as fixed by Act 1220 of 1991 result in their having less opportunity to participate in the political process than other members of the electorate; they claim only that such district lines "result" in black citizens having "less opportunity ... to elect representatives of their choice". Under *Chisom*, the plaintiffs' Complaint would not be adequate because it fails to allege *both* of the elements required by Section 2. The Complaint of the black intervenors (the "Walker" intervenors) however, while stating the Section 2 claim in several different ways, nevertheless does allege both prongs. See paragraph 30.

■ But it is not clear that the Walker intervenors contend that their having less opportunity to participate in the political processes *results* from the redistricting plan. Nor do we find an allegation that black citizens *voting in U.S. Congressional elections* have not been able to elect white candidates of their choice. All we find in that regard is the following allegation in paragraph 50:

In the modern history of the area covered by the First, Second and Fourth Congressional Districts, there has never been an African American elected to the United States House of Representatives. Since 1960, three African Americans have run unsuccessfully for Congress from the area covered by the First, Second and Fourth Congressional districts.

Therefore if a Section 2 cause of action requires *both* the allegation and proof that the new district lines result in black citizens having less opportunity to participate and also the allegation and proof of less opportunity to elect representatives of their choice, then the Walker intervenors also fall short.

Furthermore the plaintiffs and the Walker intervenors appear to rely solely on the inferences from the history of discrimination in housing, health and education as the proof for their allegation that black citizens have less opportunity to participate in the political process. This issue therefore requires no proof and may be resolved as a question of law.

Even under the majority opinion in *Jeffers*, the only basis for the intervenors to contend that black voters do not have equal opportunity to participate in the political process would be found in one of the Senate factors, i.e., the present effects of past racial discrimination in areas of health, education and employment. See *Jeffers*, 730 F.Supp. at 204. And the Senate or *Zimmer* factors cannot suffice for the proof required by Section 2. As stated in the minority-dissenting opinion in *Jeffers:*

First, Section 2(b) requires a *cause and effect* showing that the *challenged* [standard, practice or procedure (SPP)] is responsible for blacks having "less opportunity than other members of the electorate to participate in the political process." The finding in *Smith* [v. Clinton, 687 F.Supp. 1310 (E.D.Ark.1988)] means that neither present legal barriers nor the redistricting plan formulated by the Board of Apportionment in 1981 is responsible for blacks having "less opportunity than other members of the electorate to participate in the political process." Rather, it is the present effects of past discrimination in health, education and employment. Stated otherwise, the opportunity of blacks to participate in the political process would be the same regardless of the manner in which the Board drew the district lines.

\*    \*    \*    \*    \*    \*

The majority would probably reply, as certain other federal courts have, that we must look at the "interaction" of the SPP with impairments blacks suffer as a result of prior discrimination to determine if that SPP results in blacks having less opportunity to participate in the political process. This is linguistic legerdemain. Clearly it is not the line drawing

by the board—the SPP here—which "results" in blacks having less such opportunity; rather, it is the diminished socio-economic status found to have resulted from prior discrimination.[1]

[1] And rarely do courts try to quantify or identify the causes of the "diminished socio-economic status" of blacks. They appear to be satisfied if they can comfortably say it is in some degree the result of prior official discrimination. If no more is needed, this is an easy "given." But reality may make it apparent that prior discrimination played a small role. One has only to examine the reasons for the poverty and unemployment in the Delta counties of Arkansas to understand this. Blacks and whites were much better off (as compared to the rest of the state) in that area in 1970 than they are now. The district court in *Whitfield* [*v. Democratic Party of State of Arkansas,* 686 F.Supp. 1365 (E.D.Ark. 1988)] referred to "the dire economic circumstances that have developed in that area of the state over the past decade." *Id.* at 1384.

And Section 2 does not purport to give a remedy solely on the latter basis. At the risk of argumentative overkill, assume the Board had drawn the district lines exactly as plaintiffs now request. Would the opportunity of blacks "to participate" be different? Clearly not. This error in analysis I identify as the source of so much unnecessary intellectual conflict in the "voting rights" cases and as the principal source of the misuse of certain of the *Zimmer* or Senate factors.

Is not all of this obvious? The socio-economic condition of blacks in any given area—wherever it is—will always be a "given" in any voting rights challenge. And, unfortunately in this country, from sea to sea, blacks, although making significant progress, still suffer adverse effects in education, the economic arena and health, and, on a statistical basis, are simply not as well off as non-blacks in our society. So, if one accepts that being poor, uneducated, unhealthy, etc., decreases one's "opportunity to participate" in the political process, then there will be no voting SPP which will be immune from attack. Elections per se could be as readily attacked!

*Jeffers,* 730 F.Supp. at 237–38 (Eisele, C.J., dissenting).

The majority's predicate finding for its holding that the defendants in *Jeffers* violated Section 2 is that black citizens "have less opportunity than other members of the electorate to elect representatives of their choice." There is no *finding* that black voters have "less opportunity than other members of the electorate to participate in the political process." And when it comes to a discussion of the Section 2 claim, the majority in *Jeffers* states:

> At the outset, defendants make two legal arguments that would bar the action altogether if successful. First, they say that under the plain language of Section 2(b) plaintiffs must show two separate things: (1) that they have less opportunity to participate in the political process; and (2) that they have less opportunity to elect representatives of their choice. Even if they have shown the second, the argument runs, they cannot win this case, because they cannot make the first showing. There are no presently existing legal barriers to voting by black citizens in Arkansas, and therefore they have just as much opportunity to participate in the political process as anyone else.

730 F.Supp. at 204. So, even though the majority in *Jeffers* went on to say that the defendants' argument did not reckon with the present effects of past discrimination, it acknowledged that in Arkansas black voters had as much opportunity in the 1981–1990 period to participate in the political process as anyone else. It is for that reason that it recognized that if plaintiffs had to prove as an essential element of their Section 2 claim that because of the district lines they had less opportunity to participate in the political process than others, then their action under Section 2 would fail.

■ Congress did not intend to provide minority voters with the "maximum feasible minority voting strength." *Gingles,* 478 U.S. at 94, 106 S.Ct. at 2789 (O'Connor, J., concurring). The maximum minority voting strength would be tantamount to proportional representation, which is expressly prohibited by the language of the statute. Plaintiffs' argument to the contrary is inconsistent with the *"results"*

test enacted in the statute and the clear disclaimer of any right to proportional representation. *Id.* Indeed, the Supreme Court has rejected any claim to proportional representation or "maximum feasible representation" throughout the history of the Voting Rights Act. *See, e.g., White v. Regester,* 412 U.S. at 765–66, 93 S.Ct. at 2339–40 (1973); *Whitcomb v. Chavis,* 403 U.S. 124, 148–56, 91 S.Ct. 1858, 1871–76, 29 L.Ed.2d 363 (1971).

In *McNeil v. Springfield,* 851 F.2d 937 (7th Cir.1988) the district court's grant of summary judgment in favor of the defendants was attacked on appeal on the ground that summary judgment was inappropriate in Section 2 voting rights cases because the statute requires courts to take a "functional" view of the challenged process and evaluate the "totality of the circumstances." But the Court held that this argument "fails in light of *Thornburg v. Gingles*":

> To pass the summary judgment threshold, a minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. [*Gingles,* 106 S.Ct. at 2766.] The group must also show that it is politically cohesive and that white bloc voting usually thwarts election of the minority's preferred candidate. Only upon satisfaction of these threshold criteria should a court conduct its totality-of-the-circumstances analysis and consider other relevant factors set forth in *White.* As the Court explained, Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice. *Id.* at 2766–67 n. 17 (emphasis in original). Thus, although a section 2 claim potentially implicates many factors the Court stated in no uncertain terms that a challenge to a multi-member district cannot be sustained unless the *Gingles* preconditions are met. We must therefore reject appellants' contention that summary judgment is improper in section 2 cases.

\* \* \* \* \* \*

> We therefore must reject appellants' contention that a court, in considering section 2 claims, must explore the totality of the circumstances without first determining whether the *Gingles* threshold criteria are met.

*McNeil,* 851 F.2d at 942–943.

The Court concludes that there are no genuine issues of fact and that defendants are entitled to summary judgment on the Voting Rights Act claim as a matter of law.

## VI.  INTENTIONAL RACIAL DISCRIMINATION

### *The Constitutional Claims*

Plaintiffs claim that the defendants intentionally discriminated against a protected class, the black minority voters of the State of Arkansas, when they enacted Act 1220 into law. The basis of plaintiffs' claim is that "defendants took no affirmative action to ensure that a congressional district was created with a maximum percentage of black residents" and that the "effects of the proposed plan on racial minorities" was not considered in its enactment. See Complaint, p. 8.

The Court concludes that plaintiffs' claim that the defendants violated the Fourteenth and Fifteenth Amendments to the Constitution must fail as a matter of law. Plaintiffs and the Walker intervenors fail to make out a claim upon which relief may be granted based on their allegations that the legislature enacted Act 1220 with the *intention* to discriminate against them as a protected class.

The legal standard for such claims was discussed by the majority in *Jeffers v. Clinton,* 740 F.Supp. 585 (E.D.Ark.1990):

> Before discussing the proof, we must decide what legal standard applies to the question whether constitutional violations have occurred. All parties agree that intentional racial discrimination is an essential element of plaintiffs' claim under the Equal Protection Clause of the Fourteenth Amendment. They disagree, however, with respect to the Fifteenth Amendment. Plaintiffs take the position

that a discriminatory impact on black voters is sufficient to establish a Fifteenth Amendment claim. This is essentially the same legal standard as the "results test" enacted as a matter of statute by the 1982 amendments to the to the Voting Rights Act. Defendants, on the other hand, argue that intentional racial discrimination must be shown.

We think defendants have the better of the argument on this point. We look first to the text of Section 1 of the Fifteenth Amendment. It reads:

> The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

For purposes of comparison, we also set out here the text of the Equal Protection Clause of the Fourteenth Amendment:

> No State shall ... deny to any person within its jurisdiction the equal protection of the laws.

>     \*    \*    \*    \*    \*    \*

We hold that the same proof of conscious racial discrimination required to show a violation of the Equal Protection clause of the Fourteenth Amendment is also required in Fifteenth Amendment cases. *Accord, Nevett v. Sides,* 571 F.2d 209, 220–21 (5th Cir.1978). This does not mean that racial discrimination must be the sole motive behind the action challenged. It need only be one of the motivating factors but for which the action would not have been taken.

*Jeffers,* 740 F.Supp. at 587–89.

So intentional racial discrimination is an essential element that must be shown in order to state a claim for relief under the Equal Protection Clause of the Fourteenth Amendment and under the Fifteenth Amendment. *Jeffers,* 740 F.Supp. at 587–89 (citing, *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) and *Nevett v. Sides,* 571 F.2d 209, 220–221 (5th Cir.1978)). The issue is whether the legislative district boundaries were purposefully drawn to discriminate on the basis of race. *See, City of Mobile,* 446 U.S. at 67, 100 S.Ct. at 1499 (citing, *Wash-*

*ington v. Davis,* 426 U.S. 229, 240, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976); *Wright v. Rockefeller,* 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964)). However, not only must plaintiffs prove intentional discrimination but they must also prove that such intentional racial discrimination has an actual discriminatory effect. As stated by Justice White in *Davis v. Bandemer,* 478 U.S. 109, 127, 106 S.Ct. 2797, 2808, 92 L.Ed.2d 85 (1986):

> We agree ... that in order to succeed the ... plaintiffs were required to prove both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group.

■ The Court concludes that plaintiffs fail to state a claim upon which relief can be granted because they *cannot* prove, as a matter of law, that regardless of the legislative intent, Act 1220 actually has the effect of discriminating against black voters or dilutes or diminishes their influence.

■ And the Court further concludes that the Fourteenth and Fifteenth Amendments to the Constitution create no obligation on the states during the redistricting process to, as alleged here, take "affirmative action to ensure that a congressional district was created with a maximum percentage of black residents." Complaint at 8.

■ The Court also concludes that the congressional districts in effect prior to the enactment of Act 1220 were not tainted by unconstitutional racial animus. The congressional districts in force since 1982 are those districts which were formed by *this Court* in *Doulin.* The Court acted to implement its own remedy after finding that the legislative plan of 1981 violated the one person, one vote principle. The *Doulin* Court gave the Governor sufficient time to call a special session of the legislature in order to reconsider the law. The Governor decided not to call the legislature into special session. Therefore the Court, faced with a number of statutory filing deadlines for the 1982 congressional election, implemented its own plan. That plan is presumptively constitutional and has never

been challenged. The Court-imposed plan therefore insulates the state from any allegation that the 1982 congressional districts were enacted with an *intentional* racial prejudice. Furthermore, the 1982 district lines are not under attack here. Laches presumably would prevent any such attack at this late date. The 1982 plan therefore becomes the "benchmark" for determining whether the 1991 plan, under attack here, diluted black voting power by fracturing black voters into separate districts or packing them into one district.

■ Finally, the Court concludes that a compelling need to abide by the equal protection guarantee of "one person, one vote," is more than sufficient to supply the legislature with a legitimate nondiscriminatory purpose. The Arkansas General Assembly was aware of this Court's decision in *Doulin* and the subsequent Supreme Court case, *Karcher v. Daggett,* 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983), which re-stated the stringent standard for evaluating equal protection claims (described more fully below). Plaintiffs' exhibit 2. The state legislature also was aware of the need to follow the "one person, one vote" standard for evaluating equal protection claims when it considered the various proposed congressional redistricting plans earlier this year. The legislature consequently decided to follow the *Doulin* plan as closely as possible in allotting to the various legislative districts sufficient numbers of citizens so as not to violate the equal protection clause. That approach resulted in the greatest continuity and the least disruption.

■ The Court must evaluate the complaint of "intentional discrimination" under the standard set forth in *Davis v. Bandemer,* 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986) (plurality opinion), decided on the same day as *Gingles.*

*Davis* concerned a constitutional challenge to the 1981 Indiana state legislative apportionment based on the ground that the law unconstitutionally diluted the votes of Indiana Democrats. The Supreme Court reversed the judgment of the three-judge district court and held that the plaintiffs could not surmount the threshold requirement for showing discriminatory vote dilution.

Justice White, writing for four justices in *Davis,* stated the test as follows:

As with individual districts, where unconstitutional vote dilution is alleged in the form of statewide political gerrymandering, the mere lack of proportional representation will not be sufficient to prove unconstitutional discrimination. Again, without specific supporting evidence, a court cannot presume in such a case that those who are elected will disregard the disproportionately under-represented group. Rather, unconstitutional discrimination occurs only when the electoral system is arranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process as a whole.

Although this is a somewhat different formulation than we have previously used in describing unconstitutional vote dilution in an individual district, the focus of both of these inquiries is essentially the same. In both contexts, the question is whether a particular group has been unconstitutionally denied its chance to effectively influence the political process.... Statewide, ... the inquiry centers on the voters' direct or indirect influence on the elections of the state legislature as a whole. And, as in individual district cases, an equal protection violation may be found only where the electoral system substantially disadvantages certain voters in their opportunity to influence the political process effectively. In this context, such a finding of unconstitutionality must be supported by evidence of continued frustration of the will of a majority of the voters or effective denial to a minority of voters of a fair chance to influence the political process.

Based on these views, we would reject the District Court's apparent holding that *any* interference with an opportunity to elect a representative of one's choice would be sufficient to allege or make out an equal protection violation,

unless justified by some acceptable state interest that the State would be required to demonstrate. In addition to being contrary to the above-described conception of an unconstitutional political gerrymander, such a low threshold for legal action would invite attack on all or almost all reapportionment statutes. District-based elections hardly ever produce a perfect fit between votes and representation. The one-person, one-vote imperative often mandates departure from this result as does the no-retrogression rule required by section 5 of the Voting Rights Act. Inviting attack on minor departures from some supposed norm would too much embroil the judiciary in second-guessing what has consistently been referred to as a political task for the legislature, a task that should not be monitored too closely unless the express or tacit goal is to effect its removal from legislative halls. We decline to take a major step towards that end, which would be so much at odds with our history and experience.

The view that a prima facie case of illegal discrimination in reapportionment requires a showing of more than a *de minimis* effect is not unprecedented. Reapportionment cases involving the one person, one vote principle such as *Gaffney v. Cummings*[, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973)] and *White v. Regester* provide support for such a requirement. In the present, considerably more complex context, it is also appropriate to require allegations and proof that the challenged legislative plan has had or will have effects that are sufficiently serious to require intervention by the federal courts in state reapportionment decisions.

*Davis*, 478 U.S. at 132–34, 106 S.Ct. at 2810–11 (footnotes omitted).

*Davis*, as noted, did not involve allegations of racial discrimination. Rather it presented only an equal protection claim under the Fourteenth Amendment. So Section 2 of the Voting Rights Act and the Fifteenth Amendment did not come into play in that case. But *Davis* is important here for another reason which bears directly upon the propriety of disposing of this case on summary judgment. Plaintiffs here claim that they could, if given the opportunity, show that the Arkansas General Assembly, in passing Act 1220, acted with the intent to discriminate against black voters. In *Davis*, Justice White accepted that the evidentiary record in that case would support a finding of discriminatory intent:

> Further, we are confident that if the law challenged here had discriminatory effects on Democrats, this record would support a finding that the discrimination was intentional. Thus, we decline to overturn the District Court's finding of discriminatory intent as clearly erroneous.

*Davis*, 478 U.S. at 127, 106 S.Ct. at 2808.

Nevertheless the Court dismissed the case because the plaintiffs failed to make an adequate showing of discriminatory effect:

> We do not accept, however, the District Court's legal and factual bases for concluding that the 1981 Act visited a sufficiently adverse effect on the appellees' constitutional protected rights to make out a violation of the Equal Protection Clause. The District Court held that because any apportionment scheme that purposely prevents proportional representation is unconstitutional, Democratic voters need only show that their proportionate voting influence has been adversely affected. 603 F.Supp. at 1492. Our cases, however, clearly foreclose any claim that the Constitution requires proportional representation or that legislatures in reapportioning must draw district lines to come as near as possible to allocating seats to the contending parties in proportion to what their anticipated statewide vote will be. *Whitcomb v. Chavis*, 403 U.S. at 153, 156, 160, 91 S.Ct. at 1874, 1876, 1878; *White v. Regester*, 412 U.S. at 765–766, 93 S.Ct. at 2339–2340.

*Davis*, 478 U.S. at 129–30, 106 S.Ct. at 2809. And Justice White also observed: "This is true of a racial as well as a political group ... It is also true of a statewide

claim as well as an individual district claim." *Id.* at 130, 106 S.Ct. at 2809. And he points out the negative side of creating "safe districts" in order to achieve proportionate representation:

> To draw district lines to maximize the representation of each major party would require creating as many safe seats for each party as the demographic and predicted political characteristics of the State would permit. This in turn would leave the minority in each safe district without a representative of its choice. We upheld this "political fairness" approach in *Gaffney v. Cummings,* despite its tendency to deny safe district minorities any realistic chance to elect their own representatives. But *Gaffney,* in no way suggested that the Constitution requires the approach that Connecticut had adopted in that case.

> \* \* \* \* \* \*

> These holdings rest on a conviction that the mere fact that a particular apportionment scheme makes it more difficult for a particular group in a particular district to elect the representatives of its choice does not render the scheme constitutionally infirm. This conviction, in turn, stems from a perception that the power to influence the political process is not limited to winning elections.

> \* \* \* \* \* \*

> Thus, a group's electoral power is not unconstitutionally diminished by the simple fact of an apportionment scheme that makes winning elections more difficult, and a failure of proportional representation alone does not constitute impermissible discrimination under the Equal Protection Clause.

*Id.* at 130–132, 106 S.Ct. at 2809–2810. And Justice O'Connor in the concurring opinion in *Davis,* while stating her view that the plaintiffs' claim there raised a nonjusticiable political question, went on to express her concern about the efforts to establish proportional representation:

> To turn these matters over to the federal judiciary is to inject the courts into the most heated partisan issues. It is predictable that the courts will respond by moving away from the nebulous standard a plurality of the Court fashions today and toward some form of rough proportional representation for all political groups. The consequences of this shift will be as immense as they are unfortunate. I do not believe, and the Court offers not a shred of evidence to suggest, that the Framers of the Constitution intended the judicial power to encompass the making of such fundamental choices about how this Nation is to be governed. Nor do I believe that the proportional representation towards which the Court's expansion of equal protection doctrine will lead is consistent with our history, our traditions, or our political institutions.

> \* \* \* \* \* \*

> If members of the major political parties are protected by the Equal Protection Clause from the dilution of their voting strength, then members of every identifiable group that possesses distinctive interests and tends to vote on the basis of those interests should be able to bring similar claims. Federal courts will have no alternative but to attempt to recreate the complex process of legislative apportionment in the context of adversary litigation in order to reconcile the competing claims of political, religious, ethnic, racial, occupational, and socioeconomic groups.

> \* \* \* \* \* \*

> There is simply no clear stopping point to prevent the gradual evolution of a requirement of roughly proportional representation for every cohesive political group.

> \* \* \* \* \* \*

> ... no group right to an equal share of political power was ever intended by the Framers of the Fourteenth Amendment.

*Id.* at 145–147, 106 S.Ct. at 2817–2818. On the basis of the uncontested facts, plaintiffs' claim here would not meet this *de minimus* effects test. And the relief prayed for directly implicates the concerns expressed by both Justice White and Justice O'Connor.

Plaintiffs seek an evidentiary hearing to determine if the legislature in enacting Act 1220 had a racially discriminatory intent. However, it is the opinion of the Court that a discriminatory intent would be irrelevant for the purpose of the relief being sought here because it cannot be shown that the redistricting required by Act 1220 had a discriminatory effect or diluted black voting strength or influence.

## VII. MALAPPORTIONMENT

■ Plaintiffs and the Lonoke intervenor also challenge the apportionment of the population in the various congressional districts under Act 1220. They claim that the population deviation among the districts is unconstitutional because it violates the one person, one vote requirement.

The Court concludes that plaintiffs and the Lonoke intervenor state a claim on this ground. The Court further concludes that there are issues of material fact which preclude the granting of summary judgement.

The Supreme Court has held that "there are no *de minimis* population variations, which could practically be avoided, but which nonetheless meet the standard of Art. I, sec. 2, without justification." *Karcher v. Daggett,* 462 U.S. 725, 734, 103 S.Ct. 2653, 2660, 77 L.Ed.2d 133 (1983). In *Karcher,* the Supreme Court affirmed the three-judge district court which held New Jersey's 1980 congressional reapportionment scheme unconstitutional. The largest New Jersey congressional district had a population of 527,349 persons. The smallest New Jersey congressional district had a population of 524, 825 persons. The difference between them, 3,674 persons, resulted in a difference of 0.6984 percent of the population of the average district population of 526,059.

The *Karcher* Court affirmed the test that the district courts should apply in determining whether or not population variances between congressional districts are constitutional. The Court sets out the test in full:

Article I, section 2, establishes a "high standard of justice and common sense"

for the apportionment of congressional districts: "equal representation for equal numbers of people." *Wesberry v. Sanders,* 376 U.S. 1, 18 [84 S.Ct. 526, 535, 11 L.Ed.2d 481] (1964). Precise mathematical equality, however, may be impossible to achieve in an imperfect world; therefore the "equal representation" standard is enforced only to the extent of requiring that districts be apportioned to achieve population equality "an nearly as is practicable." As we explained further in *Kirkpatrick v. Preisler* [394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969)]:

[T]he "as nearly as practicable" standard requires that the State make a good-faith effort to achieve precise mathematical equality. *See Reynolds v. Sims,* 377 U.S. 533, 577 [84 S.Ct. 1362, 1390, 12 L.Ed.2d 506] (1964). Unless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small. 394 U.S. at 530–531 [89 S.Ct. at 1228–1229].

Article I, section 2, therefore, "permits only the limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown." 394 U.S. at 531 [89 S.Ct. at 1229]. *Accord, White v. Weiser,* 412 U.S. 783, 790 [93 S.Ct. 2348, 2352, 37 L.Ed.2d 335] (1973).

Thus two basic questions shape litigation over population deviations in state legislation apportioning congressional districts. First, the court must consider whether the population differences among districts could have been reduced or eliminated altogether by a good-faith effort to draw districts of equal population. Parties challenging apportionment must bear the burden of proof on this issue, and if they fail to show that the differences could have been avoided the apportionment scheme must be upheld. If however, the plaintiffs can establish that the population differences were not the result of a good-faith effort to achieve equality, the State must bear the burden of proving that each significant

variance between districts was necessary to achieve some legitimate goal. *Kirkpatrick*, 394 U.S. at 532. *Cf. Swann v. Adams*, 385 U.S. 440, 443–444 [87 S.Ct. 569, 571–572, 17 L.Ed.2d 501] (1967). *Karcher*, 462 U.S. at 730–31, 103 S.Ct. at 2658.

The Court concludes that, under the *Kirkpatrick* and *Karcher* tests, defendants are not entitled to summary judgment on this issue. There is a difference of 4,321 persons between the largest and smallest districts in Act 1220, or a difference of 0.7353 percent from the population of an average district of 587,681 residents. Plaintiffs and Lonoke intervenor bear the burden to show that the difference among the congressional districts could have been avoided. Assuming, for the purposes of the instant motion, that plaintiffs have met that burden by presenting to the Court a plan with a variance of something less than 0.15 percent, defendants bear the burden of proving that each significant variance between districts was necessary to achieve some legitimate goal. There has not been a sufficient showing of such by the defendants on the record before the Court.

## VIII. CONCLUSION

Defendants' Motion for Summary Judgment with respect to the Malapportionment claim must be denied; genuine factual issues remain.

Defendants' Motion for Summary Judgment with respect to plaintiffs' and Walker intervenors' claims under Section 2 of the Voting Rights Act and under the Fourteenth and Fifteenth Amendments must be granted because there are no genuine issues of fact affecting the disposition of said motions, and defendants are entitled to judgment as a matter of law on said claims because:

A. With respect to *both* the Section 2 and the Constitutional Claims, Act 1220 of 1991 does not have an actionable discrimi-

natory effect; its implementation would not result in dilution of claimants' political power or in claimants' having less opportunity to participate in the political process and to elect representatives of their choice.

B. With respect to the Section 2 claim:

1. Claimants cannot meet the *Gingles* preconditions:

a. Claimants cannot show that black voters can constitute a majority in a single district.

b. Claimants must show racial polarization and block voting. If they cannot so show, their Section 2 claim fails. If they can so show, that same showing would establish that packing black voters into a single district short of a majority would not increase black political "influence" but would overall decrease it.

c. Claimants cannot, as they must, establish *both* that Act 1220 resulted in black voters having less opportunity to participate in the political process than others *and* that it resulted in black voters having less opportunity to elect representatives of their choice.

The Court will therefore grant defendants' Motion for Summary Judgment as to the Voting Rights Act claim and as to the Fourteenth and Fifteenth Amendment claims.

IT IS THEREFORE ORDERED that defendants' Motion for Summary Judgment, be, and it is hereby, GRANTED IN PART AND DENIED IN PART. The Court grants the Motion for Summary Judgment as to plaintiffs' and intervenors' Voting Rights Act claim and as to plaintiffs' and intervenors' claim that Act 1220 violates the Fourteenth and Fifteenth Amendments, in accordance with the terms of this Order. The Court denies the Motion for Summary Judgment as to the malapportionment claim.[21]

---

**21.** The denial of defendants' Motion for Summary Judgment on the malapportionment claim was earlier communicated to counsel. An evidentiary hearing was thereupon scheduled on such issue for September 3, 1991. At the con-

clusion of the hearing the Court informed the parties that it was denying and dismissing plaintiffs' claim. A supplementary opinion of even date herewith sets forth in greater detail the basis of the Court's decision, 784 F.Supp. 585.

HENRY WOODS, District Judge, concurs.

McMILLIAN, Circuit Judge, concurs in result and judgment only.