**LITTLE ROCK SCHOOL DISTRICT, Plaintiff,**

v.

**PULASKI COUNTY SPECIAL SCHOOL DISTRICT NO. 1, et al., Defendants,**

Mrs. Lorene Joshua, et al., Katherine W. Knight, et al., Intervenors.

No. LR–C–82–866.

United States District Court, E.D. Arkansas, W.D.

June 21, 1993.

John W. Walker, Little Rock, AR, for Charles' plaintiffs.

Larry D. Vaught, Pulaski County Atty.'s Office, Little Rock, AR, for Pulaski County Bd. of Educ.

Chris Heller, Little Rock, AR, for Little Rock School Dist.

### MEMORANDUM OPINION AND ORDER

SUSAN WEBBER WRIGHT, District Judge.

In this action, which is part of the continuing case concerning the desegregation of the

school districts of Pulaski County, Arkansas, plaintiffs challenge the existing zones used to elect members of the Little Rock School District Board of Directors as well as the new zones adopted by the Pulaski County Board of Education. Plaintiffs allege violations of the Voting Rights Act, 42 U.S.C. § 1973 et seq. (Supp.1992), and the Fourteenth Amendment to the United States Constitution. They argue that the present plan violates the one-man one-vote principle and dilutes minority voting strength, and that the new plan packs the black voting age population into two zones even though blacks are numerically large and geographically compact to constitute a third majority black zone.

This case was tried to the Court on April 13 and 14, 1993. The Court makes the following findings of fact and conclusions of law required by Fed.R.Civ.P. 52. Any other statement in this opinion which may be deemed a finding of fact is also adopted as such.

## FINDINGS OF FACT

1. The named plaintiffs, Dale Charles, Robert L. Brown, Sr., Gwen Hevey Jackson, Diane Davis, and Raymond Frazier ("Charles plaintiffs"), are black adult residents of the Little Rock School District. The Charles plaintiffs' amended complaint has been consolidated with Case No. LR–C–82–866, *Little Rock School District v. Pulaski County Special School District.* The Charles plaintiffs bring this action

> to reform the single member district school zone lines which are utilized by the defendants in school elections for the purpose of electing school directors. This is also an action to ensure that such reformation is pursuant to and consistent with the Voting Rights Act of 1965, as amended. Plaintiffs seek to have the district reformed into seven (7) single member districts of approximately equal population pursuant to a plan that allows citizens of African American descent the opportunity to maximize their opportunity to participate in the political process and to elect representation of their choice.

2. Defendants are the Little Rock School District ("LRSD"), the members of the Board of Directors of the LRSD, the Pulaski County Board of Education ("PCBE"), and the members of the PCBE.

3. Pursuant to Ark.Code Ann. § 6–13–607 (Michie 1991), the PCBE has the responsibility to divide school districts which have an average daily attendance in excess of 24,000 students into zones for the purpose of electing members to that school district's board of directors.

4. The present LRSD election zones were established by order of the court on December 18, 1986, after certain areas of the Pulaski County Special School District were annexed to the LRSD. Following the annexation, the LRSD presented a proposal for zone elections to Judge Henry Woods. That proposal was the subject of a December 9, 1986 pretrial conference. LRSD Exhibit 1. On December 10, 1986, the LRSD Board of Directors voted unanimously to approve the zone proposal. Charles Exhibit 36. The zones adopted in 1986 had the following populations and racial compositions according to the 1980 Census data:

> Zone 1—25,399 total population; 81.50% black;
>
> Zone 2—25,295 total population; 68.90% black;
>
> Zone 3—25,210 total population; 7.83% black;
>
> Zone 4—24,844 total population; 2.96% black;
>
> Zone 5—25,016 total population; 18.30% black;
>
> Zone 6—25,107 total population; 17.30% black;
>
> Zone 7—25,043 total population; 14.10% black.

In adopting the above zones in 1986, the court found that the "seven (7) contiguous zones with comparable populations comports with the one-man one-vote principle required by the constitution" and that "the Little Rock School District's redistricting plans are in compliance with the mandate of § 2 of the Voting Rights Act (codified as 42 U.S.C. § 1973) and does not abridge or deny the right of minorities to vote." *See* document 719; Charles Exhibit 13.

5. After the filing of this complaint, all the parties agreed that the 1986 plan was not in compliance with the one-man one-vote principle when judged by the 1990 census figures. The Court postponed the September 1992 school board elections and directed the PCBE to determine whether the zones were out of compliance with the one-man one-vote principle and to redraw the lines if necessary.[1]

6. The PCBE, through the Pulaski County judge, commissioned the Metropolitan Area Planning Commission ("Metroplan"), a governmental planning and research organization composed of local government entities in the Central Arkansas area, to address the issue and to devise a remedial plan if necessary. The PCBE instructed Metroplan to examine the one-man one-vote issue and draw three or four alternate plans, keeping the zones compact and contiguous and as close to the present zones as possible in order to support stability in the LRSD.

7. The PCBE determined that the 1986 plan should be used as the starting point for any new plan. It did not instruct Metroplan on the voting rights issue because it understood that the 1986 plan was in compliance with the Voting Rights Act.

8. Mr. Jim McKenzie, executive director of Metroplan, contacted Mr. James R. Lynch, a senior research specialist at the University of Arkansas at Little Rock's Arkansas Institute of Government, and requested additional criteria that should be considered in rezoning cases. Mr. Lynch provided him with a two-page summary which Mr. McKenzie used in developing the alternative plans presented to the PCBE. The factors listed by Mr. Lynch were: adherence to the one-man one-vote doctrine; avoidance of diluting minority political expression; compact and contiguous districts; recognizable district boundaries; and use of existing political boundaries. Charles Exhibit 24.

9. The Metroplan staff drafted four proposed zoning plans and Mr. McKenzie re-viewed the plans to see if they met Mr. Lynch's criteria. Mr. McKenzie presented the proposals to the PCBE at a public meeting on November 6, 1992. The PCBE then held two public hearings on November 30, 1992 and December 7, 1992 to answer questions about the plan revisions. Charles Exhibits 9 and 10.

10. During the public hearings, the issue of a third majority black district was raised. Mr. John W. Nagel, Jr. presented a plan he had drawn up for the Charles plaintiffs which included three majority black districts. Mr. McKenzie testified that Metroplan could have drawn a plan with three majority black zones but the criteria of compactness and minimum change in present zones would have been sacrificed.

11. On December 29, 1992, at a specially called meeting, the PCBE selected Metroplan's Proposal No. 4 as its plan for bringing the present zones into compliance. The vote was three to one, with the three white members voting for Proposal No. 4 and the one black member voting against it. Charles Exhibit 12.[2]

12. Mr. McKenzie testified that Proposal No. 4 looks more to the future in terms of growth and shifts in population than the other proposals. In Proposal No. 4, the areas of the City of Little Rock that are projected for growth have a negative variance from the mean while the areas that are projected to lose population have a positive variance.

13. On February 16, 1993, the PCBE submitted its approved plan to the Court, and the Charles plaintiffs filed objections to the plan.

14. There was no racially discriminatory motive, intent, or purpose involved in the adoption by the PCBE of the districting plan at issue in this case. The Charles plaintiffs presented no evidence from which this Court can conclude that the plan adopted by the PCBE was the result of purposeful racial discrimination. The PCBE adopted its plan

---

1. The Court also postponed the PCBE Zone 5 election.

2. The Charles plaintiffs argue that the PCBE did not legally adopt Metroplan's Proposal No. 4 but

merely voted to submit it to the Court, thereby abandoning its duty to adopt a plan. The Court finds that the PCBE adopted Proposal No. 4 pursuant to Ark.Code Ann. § 6–13–607.

after two public hearings at which the merits of the various plans before the PCBE were discussed. The plan eventually adopted by the PCBE was drawn according to generally accepted criteria provided by the Charles plaintiffs' expert in this case, Mr. Lynch.

15. The City of Little Rock is approximately 65% white and 34% black. Charles Exhibit 25. The voting age population of the City of Little Rock is approximately 70% white and 29% black. Charles Exhibit 26. The City of Little Rock and the LRSD are nearly coterminous. The significant exceptions are the Granite Mountain area, which is a predominantly black area within the City of Little Rock but not within the LRSD, and Cammack Village, a predominantly white area which is within the LRSD but not within the City of Little Rock.

16. The plan adopted by the PCBE has the following characteristics:

Zone 1—25,533 total population; 79.82% black;

Zone 2—25,764 total population; 59.39% black;

Zone 3—24,578 total population; 4.52% black;

Zone 4—24,216 total population; 5.12% black;

Zone 5—24,456 total population; 19.14% black;

Zone 6—24,663 total population; 35.55% black;

Zone 7—24,464 total population; 28.45% black.

See Attachment A.

17. The plan presented by the Charles plaintiffs has the following characteristics:

Zone 1—23,704 total population; 64.7% black;

Zone 2—24,870 total population; 64.0% black;

Zone 3—24,230 total population; 5.3% black;

Zone 4—25,380 total population; 5.1% black;

Zone 5—23,839 total population; 8.7% black;

Zone 6—25,635 total population; 61.7% black;

Zone 7—26,016 total population; 25.8% black.

See Attachment B.[3]

18. The plan proposed by the Charles plaintiffs does not conform to the standard proposed by their expert, Mr. Lynch, that the zones be compact and contiguous.

19. There are no significant barriers to participation in the political process in the LRSD. In order to run for the LRSD Board of Directors, a candidate is required to gather twenty signatures on a petition. Ark. Code Ann. § 6–14–111 (Michie 1991). There is no filing fee. There was no testimony that there exist any legal barriers to participation in the political process by black candidates.

20. No evidence was presented to show that black citizens have less opportunity to participate in the political process under the plan adopted by the PCBE than they do under the present plan. Mr. Lynch, expert witness for the Charles plaintiffs, testified that the opportunity for black citizens to participate in the political process is the same under the present plan and the plan adopted by the PCBE.

21. Black citizens do not have less opportunity to elect representatives of their choice under the plan adopted by the PCBE than they do under the present plan. Mr. Lynch testified that the opportunity for black citizens to elect representatives of their choice is the same under the plan adopted by the PCBE and the present plan.

22. In *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the Supreme Court referred to factors listed in the Senate Judiciary Committee report accompanying the 1982 amendments to § 2 of the Voting Rights Act as being relevant to a § 2 claim. The Court makes the following findings in accordance with those factors:

---

**3.** The Court notes that the plan filed as Plaintiff's Exhibit A with the Charles plaintiffs' "Objections, Response and Memorandum Regarding the Court's Order of February 16, 1993," (doc. # 1762) has the same boundary lines as Attachment B but some of the zones are numbered differently. (See Attachment C.)

A. The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process.

While the Charles plaintiffs presented no evidence of a history of official discrimination, the Court will take judicial notice that there has been a history of official discrimination in voting. *Jeffers v. Clinton,* 730 F.Supp. 196, 210 (E.D.Ark.1989). The Charles plaintiffs presented no evidence, other than demographic information which shows socio-economic differences between blacks and whites, that the history of official discrimination in Arkansas has resulted in black citizens having less opportunity to participate in the political process and to elect representatives of their choice under the plan proposed by the PCBE. This demographic evidence does not prove or disprove that the district lines drawn in 1986 or 1992 resulted in blacks having less opportunity to participate in the political process and to elect representatives of their choice. The history of official discrimination is remote in time to the preparation of the PCBE plan and will therefore be given little weight.

B. The extent to which voting in the elections of the state or political subdivision is racially polarized.

The evidence presented by the Charles plaintiffs tends to indicate that black voters constitute a politically cohesive unit. Mr. Lynch showed that a significant number of minority group members usually vote for the same candidates. He presented evidence of a correlation between black voting age population and the percentage of votes received by black candidates.

The Charles plaintiffs failed to prove that white bloc voting normally will defeat the combined strength of minority support plus any white cross-over vote for black candidates. The evidence was insufficient to show that white voters tend to group together to defeat black candidates. The evidence indicates that black candidates have achieved considerable success against white candidates.

Charles Exhibits 32 and 33 show ten elections (nine at large; one zone) since 1986 in which black candidates opposed white candidates. In six of those elections, the black candidate was successful. Only two of the elections involved the LRSD. In both the at-large 1986 LRSD race and the LRSD Zone 2 1989 race, the black candidate defeated the white candidate. In the 1988 race for a municipal judgeship in the City of Little Rock, the black candidate was successful. The black candidates were also successful in three of the seven at-large elections for a position on the Little Rock City Board of Directors.

Charles Exhibit 35 shows the results of twenty-five elections between 1962 and 1992 in which black candidates sought positions on the Little Rock City Board of Directors. The black candidates were successful in ten of those elections.

The Court finds that there does not exist in Little Rock a sufficient white bloc vote to usually defeat the candidate preferred by minority voters. Although there was some evidence that a significant number of minority group members usually vote for the same candidate, the Court finds that legally significant racially polarized voting does not exist in the City of Little Rock or the LRSD.

C. The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group.

There is no evidence that the LRSD has adopted any practice or procedure that may enhance the opportunity for discrimination against the minority group. The State of Arkansas has adopted a majority vote requirement which applies to school district elections. Ark.Code Ann. § 6–14–121 (Michie 1991). There is no evidence that the majority vote requirement has had any impact on the success or failure of any black candidate in a school district election.

D. If there is a candidate slating process, whether the members of the minority group have been denied access to that process.

■ The process of slating plays no part in races for the LRSD Board of Directors. Nominations are not made by committee or convention. Anyone who wants to run simply files as an individual in the election. There is no filing fee. A petition signed by twenty qualified registered voters is sufficient to get a candidate on the ballot. Mr. Bill Hamilton and Mr. Thomas Broughton, both of whom are black and have been elected to the LRSD Board of Directors, testified that there are no impediments to ballot access. Mr. Lynch testified that the "white power structure" throws its support to certain candidates. This does not constitute slating as that term has been used by the courts in considering the Senate factors. *See, e.g., Jeffers*, 730 F.Supp. at 212.

E. The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process.

■ Census data, which indicates that in the City of Little Rock blacks are poorer, less educated, have fewer vehicles, and have a higher percentage of households headed by single females than the general population, convinces the Court that minorities in the Little Rock area have suffered the disadvantages of past discrimination. Charles Exhibits 27, 28, 29, 30, and 31. These socio-economic factors have an impact upon the ability of blacks to participate effectively in the political process. For example, while blacks comprise 34% of the population of Little Rock, they comprise only 29% of the voting age population. Mr. Lynch testified that blacks also suffer lower voter registration and lower voter turnout among registered voters than whites.

F. Whether political campaigns have been characterized by overt or subtle racial appeals.

The Charles plaintiffs presented no evidence of overt or subtle racial appeals in LRSD election campaigns. Mr. Bill Hamilton testified that in 1973 he actively supported a white school board candidate, Lucy Abraham, and that in 1983 he received wide support from the white community.

G. The extent to which members of the minority group have been elected to public office in the jurisdiction.

■ The Charles plaintiffs presented evidence of only two LRSD elections. Black candidates won them both. They presented evidence on one election for the position of municipal judge, and that race was won by a black. As noted above under subparagraph B, the plaintiffs presented evidence of twenty-five elections for the position of Little Rock City Board of Directors from 1962 to 1992 in which black candidates participated. Black candidates won ten of the twenty-five races in which one or more blacks participated. Charles Exhibit 35. LRSD Exhibit 2 shows that in 1983 two black candidates ran at-large races for positions on the LRSD Board of Directors, each opposing a white candidate. Black candidates Bill Hamilton and Katherine Mitchell received 70% and 34% of the vote, respectively. According to LRSD Exhibit 5, Mr. Hamilton received 82% of the vote against white candidate Frederick Lee in the 1989 LRSD Zone 2 election. LRSD Exhibit 4 shows that white candidate Charles Young defeated black candidate Lawrence Hampton in the 1987 Zone 6 race by a slim margin, 250 to 218 votes. Zone 6 was then a 72% white zone.

The percentage of black representation for at least the last ten years on both the LRSD Board of Directors and the City of Little Rock Board of Directors has been 28.5% compared with a city-wide black population of 34% and a black voting age population of 28%.

Mr. Hamilton testified that it only takes about 300 votes to win an election within the present LRSD election zones. His testimony is borne out by LRSD Exhibits 4 and 5. The minimum black population in an election zone in the plan adopted by the PCBE is 1,112. PCBE Exhibit 1, p. 2. The five most heavily

black zones range from 4,681 to 20,380 black population. There exists in at least five of the zones adopted by the PCBE, if not all of them, a sufficient black population from which to draw the number of votes usually necessary to elect a black candidate to the LRSD Board of Directors.

H. Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the minority group.

■ Mr. Dale Charles, president of the Little Rock Chapter of the NAACP, testified that he had raised several issues at LRSD board meetings and had received no written response from the Board. However, there was no testimony that the Board usually provides a written response or that whites who presented issues to the Board received written responses. Mr. Charles admitted that he had never sought to discuss any LRSD issue with his zone representative, who is white, because he assumed his representative would be antagonistic to him.

Mr. Charles further testified that he had made presentations to the Board on several occasions. Dr. Mitchell and Mr. Hamilton testified generally that the Board was not as responsive as it could be to some issues of concern to the black community, but that any two members of the Board could call a public meeting to discuss any issue of concern to those two members.

Board member Patricia Gee testified that she lives in a racially mixed neighborhood (her zone is presently 28.55% black) and that she works as hard to resolve issues brought to her by black constituents as she does to resolve issues brought to her by white constituents.

I. Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

■ The Court finds that the adoption by the PCBE of the election zones prepared by Metroplan is not a practice that can be described as "tenuous." The starting point for the development of the plan adopted by the PCBE was a plan adopted by the court in 1986 which the court found to be in compliance with the Voting Rights Act.

CONCLUSIONS OF LAW

■ 1. The Charles plaintiffs claim the 1986 redistricting plan violates the one-man one-vote principle and the Voting Rights Act. They also challenge the redistricting plan for the LRSD Board of Directors adopted by the PCBE, claiming it violates § 2 of the Voting Rights Act, 42 U.S.C. § 1973, and the Fourteenth Amendment of the Constitution. This Court ordered the PCBE to develop a plan in light of the 1990 census to bring the LRSD districting plan into compliance with the one-man one-vote requirement of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. All of the parties agreed that the old plan, which had been in effect by order of Judge Henry Woods since December of 1986, was not in compliance with the one-man one-vote requirement when judged by the 1990 census information. Now that the PCBE has adopted a new districting scheme, the plaintiffs' allegations that the 1986 plan violated the Voting Rights Act have become moot.[4] *See Growe v. Emison,* 507 U.S. ——, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993).

■ 2. This Court may not substitute its judgment for that of the PCBE. The Supreme Court has held it is error for a federal district court not to defer to state efforts to redraw legislative districts. *Voinovich v. Quilter,* 507 U.S. ——, ——, 113 S.Ct. 1149, 1157, 122 L.Ed.2d 500, 513, 61 U.S.L.W. 4199, 4202 (1993). *See also Turner v. State of Arkansas,* 784 F.Supp. 553, 573 (E.D.Ark.1991), *aff'd* —— U.S. ——, 112 S.Ct. 2296, 119 L.Ed.2d 220 (1992). Therefore, this Court may not alter or amend the dis-

4. The issue of whether the doctrine of *res judicata* or collateral estoppel preclude the Charles plaintiffs from challenging the 1986 plan was raised during these proceedings. The Court finds it unnecessary to address the issue because it determines that challenges to the 1986 plan are arguably moot but, as noted below, the Court will give effect to the 1986 plan as the law of the case.

tricting plan adopted by the PCBE absent finding a violation of federal law.

■ 3. In order to prevail on their claim that the new districting plan violates § 2 of the Voting Rights Act, the plaintiffs must prove that they will have less opportunity under the plan adopted by the PCBE to participate in the political process and less opportunity to elect representatives of their choice than under the plan approved by Judge Woods in December of 1986. *Chisom v. Roemer*, 501 U.S. ——, ——, 111 S.Ct. 2354, 2365, 115 L.Ed.2d 348, 364 (1991); *Turner*, 784 F.Supp. at 589. In order to prevail on their constitutional claim, the plaintiffs must show that there existed a purposeful intent to discriminate on the part of the PCBE. *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). Plaintiffs have not met their burden as to either their § 2 claim or their constitutional claim.

■ 4. The PCBE is not required by the Voting Rights Act to create the maximum number of majority black districts. The Act is not an affirmative action statute, and it "is not violated by a state legislature simply because that legislature does not enact a districting plan that maximizes black political power and influence." *Turner*, 784 F.Supp. at 573. The *Turner* court explained:

> Congress did not intend to provide minority voters with the "maximum feasible minority voting strength." *Gingles*, 478 U.S. at 94, 106 S.Ct. at 2789 (O'Connor, J., concurring). The maximum minority voting strength would be tantamount to proportional representation, which is expressly prohibited by the language of the statute.

*Turner*, 784 F.Supp. at 577. The mandate of the Voting Rights Act is "you shall not harm" rather than "you shall help." *Jeffers*, 730 F.Supp. at 241 (Eisele, J., concurring and dissenting). Thus, the Voting Rights Act does not require the PCBE to create another majority black district.

5. In *Jeffers*, 730 F.Supp. at 205, the court discussed vote dilution claims in the single-member district context. It stated:

> If lines are drawn that limit the number of majority-black single-member districts, and reasonably compact and contiguous majority-black districts could have been drawn, and if racial cohesiveness in voting is so great that, as a practical matter, black voters' preferences for black candidates are frustrated by this system of apportionment, the outlines of a Section 2 theory are made out. Whether such a claim will succeed depends on the particular factual context, including all of the factors that *Thornburg, Smith,* and the legislative history of Section 2 say are relevant.

6. Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, as amended in 1982, provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) [of this title], as provided in subsection (b) [of this section].

> (b) A violation of subsection (a) of this section is established if, based upon the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

7. It is clear that in order to prevail on their § 2 claim, plaintiffs must prove both less opportunity to participate in the political process and less opportunity to elect repre-

sentatives of their choice. In *Chisom,* the Supreme Court stated:

> [T]he inability to elect representatives of their choice is not sufficient to establish a violation unless, under the totality of the circumstances, it can also be said that the members of the protected class have less opportunity to participate in the political process. The statute does not create two separate and distinct rights.
>
> \* \* \* \* \* \*
>
> It would distort the plain meaning of the sentence to substitute the word "or" for the word "and." Such radical surgery would be required to separate the opportunity to participate from the opportunity to elect.

*Chisom,* 501 U.S. at ——, 111 S.Ct. at 2365, 115 L.Ed.2d at 364. *See Turner,* 784 F.Supp. at 574 n. 20. The *Turner* court provided guidance for determining whether a plaintiff will have "less opportunity" to participate:

> "Less opportunity" by any fair interpretation means "less opportunity" than such black voters had immediately before the imposition or application of the challenged procedure; not "less opportunity" than they would have, had the legislature seized the opportunity to help them by maximizing their political influence.

*Turner,* 784 F.Supp. at 573.

8. As previously noted, the Senate has identified a number of factors which may be relevant to a § 2 claim:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivisions is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Gingles,* 478 U.S. at 30, 44–45, 106 S.Ct. at 2752, 2762–63 (1986). Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are unresponsiveness on the part of elected officials to the particularized needs of the members of the minority group and whether the policy underlying the state or political subdivision's use of the contested practice is tenuous. *Id.* at 45, 106 S.Ct. at 2763.

9. Consideration of the Senate factors in determining whether a violation of § 2 exists has been criticized because the factors often take attention away from the real issue. In this regard, the court in *Whitfield v. Democratic Party of Arkansas,* 686 F.Supp. 1365 (E.D.Ark.1988), *aff'd* 902 F.2d 15 (8th Cir. 1990) wrote:

> Having reviewed the Senate Report factors and some of the proof relating thereto, the Court must determine whether its positive findings with respect to many of those factors make it more probably true than not true that the challenged runoff provision makes the political processes not "equally open to participation" by blacks in that blacks have "less opportunity than whites to participate in the political process and to elect representatives of their choice."

It should be apparent by now that most of the positive findings with respect to the Senate Report factors have no tendency to

prove, or disprove, that proposition. The truth is that focusing on some of those factors serves more as a distraction than a useful tool for evaluating the cause and effect operation of the challenged runoff laws.

*Id.* at 1386–87. *See also, Jeffers,* 730 F.Supp. at 232 (federal courts have felt the need to make findings concerning the Senate factors whether or not they have any relevance to the issues at hand). An evaluation of the Senate factors adds little to the inquiry here of whether, under the new districting scheme adopted by the PCBE for the LRSD Board of Directors, the Charles plaintiffs have "less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice." 42 U.S.C. § 1973(b). Each Senate factor is discussed above in the Court's findings of fact. Further discussion of each factor is not necessary. The Senate factors will be discussed below only where they are relevant to the issue being analyzed.

■■■ 10. The first question in analyzing the Charles plaintiffs' § 2 claim is whether the challenged plan results in them having "less opportunity than other members of the electorate to participate in the political process ..." 42 U.S.C. § 1973(b). Here, the Charles plaintiffs must prove that the districting scheme adopted by the PCBE results in their having less opportunity to participate in the political process than under the 1986 plan.

In this regard, the Charles plaintiffs presented proof with respect to the Senate factor concerning the residual effects of past discrimination. As the court stated in *Whitfield,* "[b]ecause there are no legal barriers remaining to the opportunity of blacks to participate in the electoral process, plaintiffs have naturally emphasized the 'socioeconomic' factors." 686 F.Supp. at 1384. *See also Turner,* 784 F.Supp. at 577 ("There are no presently existing legal barriers to voting by black citizens in Arkansas, and therefore they have just as much opportunity to participate in the political process as anyone else.") (quoting *Jeffers,* 730 F.Supp. at 204); *Leadership Roundtable v. City of Little Rock,* 499 F.Supp. 579, 584 (E.D.Ark.1980) ("Since

1965, there has been no legal impediment in Arkansas to voting by blacks.").

In *Jeffers,* 730 F.Supp. 196, a case challenging the state apportionment plan, the court found no voting rights violation in Pulaski County. The court found that while the county shares many of the same characteristics of other areas of the state, racial polarization in voting and the extent of socioeconomic depression among black people are less pronounced in Pulaski County. "More importantly, the whole political atmosphere, with respect to black opportunity and participation, seems more open." *Id.* at 216.

The Charles plaintiffs rely entirely on Mr. Lynch's compilation of census data indicating that blacks are poorer, less educated, have fewer vehicles, and have a higher percentage of households headed by single females than the general population. Mr. Lynch concludes that these socio-economic factors decrease the ability of blacks to participate in the political process. Consideration of these factors, however, provides no insight into whether the districting scheme adopted by the PCBE provides the Charles plaintiffs with less opportunity to participate in the political process than under the previous plan. Regardless of where the lines are drawn, the Charles plaintiffs will have the same socio-economic status. "[I]t is not the line drawing by the [PCBE] which 'results' in blacks having less such opportunity; rather, it is the diminished socio-economic status found to have resulted from prior discrimination. And Section 2 does not purport to give a remedy solely on the latter basis." *Jeffers,* 730 F.Supp. at 237.

Therefore, the Charles plaintiffs have not proved that they have less opportunity to participate in the political process under the districting plan adopted by the PCBE.

■■■ 11. The second element of a Voting Rights Act claim which the Charles plaintiffs have the burden to establish is that they have less opportunity to elect representatives of their choice under the districting scheme adopted by the PCBE than under the 1986 districting plan. The Supreme Court has identified three "necessary preconditions" to a finding that a districting scheme impairs

minority voters' ability to elect representatives of their choice:

First, that [the minority group] is sufficiently large and geographically compact to constitute a majority in a single-member district. If it is not, as would be the case in a substantially integrated district, the multi-member form of the district cannot be *responsible* for minority voters' inability to elect its candidates. Second, the minority group must be able to show that it is politically cohesive. If the minority group is not politically cohesive, it cannot be said that the selection of a multi-member electoral structure thwarts distinctive minority group interests. Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as a minority candidate running unopposed ... usually to defeat the minority's preferred candidate. In establishing this last circumstance, the minority group demonstrates that submergence in a white multi-member district impedes its ability to elect representatives of its chosen representation.

*Gingles,* 478 U.S. at 50–51, 106 S.Ct. at 2766–67. These "necessary preconditions" will be discussed in turn.[5]

<span>◼</span> 12. More than mere numerical superiority needs to be considered in determining whether the Charles plaintiffs constitute a sufficient majority in a single-member district to elect representatives of their choice. They must constitute more than a simple majority in order to ensure that they have the opportunity to elect candidates of their choice. As the court explained in *Smith v. Clinton,* 687 F.Supp. 1361, 1363 (E.D.Ark. 1988):

A guideline of 65% of total population is frequently used, and is derived by supplementing a simple majority with an additional 5% to offset the fact that minority population tends to be younger than that of whites, 5% for the well-documented pattern of low voter registration, and 5% for low voter turnout among minorities.

*See also Fletcher v. Golder,* 959 F.2d 106, 110 (8th Cir.1992). Therefore, the minority group must be sufficiently large and geographically compact that one or more zones with at least 65% minority population may be created.

The Charles plaintiffs argue that three majority black districts should be created. The zones they propose, however, all fall below the 65% guideline. The Charles plaintiffs' proposed Zone 1 is 64.7% black, but it encompasses an area of declining black population and has an initial population variance of −4.5%. The other two proposed majority black zones are 61.7% and 64% black. The minority group is apparently not sufficiently large and geographically compact to allow for the creation of three majority black zones which meet the 65% guideline.[6] It is possible that black voters will be able to elect representatives of their choice with a black majority of less than 65% because of white "crossover" votes, but this argument only goes to show that Little Rock does not suffer from racially polarized voting, another "necessary precondition" for a successful voting rights claim.

<span>◼</span> 13. The Court will discuss black political cohesiveness and white bloc voting together because the Charles plaintiffs relied upon the same evidence to attempt to prove both of these preconditions. In an effort to establish racially polarized voting, Mr. Lynch computed for ten elections the correlation coefficient by comparing the percentage of votes for the black candidate with the percentage of black voting age population. He also compared for the same ten races the percentage of votes for the white candidate with the percentage of white voting age population. Charles Exhibits 32 and 33. Mr. Lynch concluded from Exhibit 32 that blacks are politically cohesive and that Exhibit 33 shows white bloc voting. The Court deter-

---

5. The Court follows the *Gingles* preconditions but notes that *Gingles* addressed alleged voting rights violations in the context of a multi-member structure. In *Growe, supra,* the Supreme Court held that the *Gingles* preconditions apply in challenges to single-member districts.

6. The Court notes that one of the zones in the plan adopted by the PCBE has a black population under 65%.

mines that the data shows a relationship between the percentage of black voters and the support received by a black candidate. Mr. Lynch admitted, and the Court finds, that this does not prove that blacks tend to vote for blacks and whites tend to vote for whites. The exhibits provide little insight into whether blacks are politically cohesive or whether whites vote as a block. In fact, racial polarization may not be shown where, in six of ten races with a black candidate facing a white candidate head to head, the black candidate won.

14. In general, "a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting." *Gingles,* 478 U.S. at 56, 106 S.Ct. at 2769. This situation simply does not exist in Little Rock. In 1980, Judge Eisele, after careful review of a voluminous amount of data, concluded that Little Rock does not have racially polarized voting. *Leadership Roundtable, supra.* This Court also concludes that racially polarized voting does not exist in Little Rock.

The Court is mindful of Mr. Lynch's testimony that many factors other than race determine the outcomes of elections. This evidence is relevant to determine whether "bloc voting by white voters will consistently defeat minority candidates." *Gingles,* 478 U.S. at 100, 106 S.Ct. at 2792 (O'Connor, J., concurring). It also "would suggest that another candidate, equally preferred by the minority group, might be able to attract greater white support in future elections." *Id.* The Charles plaintiffs have not set forth proof that other factors usually determinative of political success, i.e. the candidates' platforms and policies, their ability as speakers, their "track records" in the community, their name recognition, their financial support, were not the factors which attracted white voters. *See Jeffers,* 730 F.Supp. at 246 (Eisele, J., concurring and dissenting).

15. In the terminology of § 2, the Charles plaintiffs claim vote dilution due to "packing" of blacks into two districts with unnecessarily large black majorities, thereby preventing the creation of a third majority black district. A comparison of the plan adopted by the PCBE and the 1986 plan, however, reveals that both when it was adopted in 1986 and when Metroplan revisited it in 1992, the prior plan exhibited more packing than the PCBE plan. In fact if plaintiffs' concern is "packing," they are better off under the plan adopted by the PCBE than they have been since the LRSD Board members have been elected from single-member districts.[7]

In addition, the Charles plaintiffs' claim of packing is barred by the doctrine of law of the case. As noted above, the plan adopted by the PCBE has less "packing" than Judge Woods' plan when adopted in 1986, which was expressly found to be in accord with the Voting Rights Act. The law of the case doctrine provides that when a court decides an issue of law, that decision continues to govern the same issues at subsequent stages of the same case. *Morris v. American National Can Corp.,* 988 F.2d 50 (8th Cir.1993). The doctrine was created to prevent re-litigation of settled issues in a case and to protect the settled expectations of the parties, ensuring uniformity of decisions and promoting judicial efficiency. *Id.* Furthermore, "[t]he law of the case doctrine applies to issues implicitly decided in earlier stages of the same case." *Little Earth of United Tribes v. Department of Housing,* 807 F.2d 1433, 1438 (8th Cir.1986).

In the case at hand, it was implicit in Judge Woods' December 1986 order that the percentage of black population in the court-approved plan did not constitute "packing" or dilution of black voting strength in violation of the Voting Rights Act. His finding was not appealed. Therefore, it is the law of this case that the percentages of black population in the plan adopted by the PCBE, which are less than in the previous court-approved plan, are also consistent with the Voting Rights Act.

---

7. The plan approved by Judge Woods in December 1986 had two majority black zones with 81.50% and 68.90% black population, compared with 79.82% and 59.39% in the PCBE plan.

Under the 1986 districting scheme, the two majority black zones had 84.35% and 74.97% black population according to the 1990 census.

16. The Charles plaintiffs have not proved either element of a Voting Rights Act claim. The PCBE plan does not result in less opportunity to participate in the political process based on the socioeconomic effects of past discrimination because these socioeconomic factors are present regardless of where the lines are drawn. The Charles plaintiffs did not establish the "necessary preconditions" in order to show less opportunity to elect representatives of their choice. Even if they made such a showing, the Charles plaintiffs' claim fails due to the law of the case doctrine. The districting scheme adopted by the PCBE has less "packing" than the prior plan has now or when it was approved by Judge Woods in 1986. For all the above reasons, the relief sought by the plaintiffs is denied.

17. In order to establish that the districting scheme adopted by the PCBE is unconstitutional, the plaintiffs must prove that the plan was adopted with purposeful intent by the members of the PCBE to discriminate against the Charles plaintiffs. *City of Mobile*, 446 U.S. 55, 100 S.Ct. 1490.

The members of the PCBE reasonably believed that the plan approved by Judge Woods in 1986 met all the requirements of the Voting Rights Act and the Constitution. They sought to make only the minimum required changes to that plan and to make those changes in compliance with the Court's instructions and federal law. The evidence is undisputed that the PCBE members did not act with the intent to discriminate against the plaintiffs. The Charles plaintiffs' constitutional claims are denied.

18. The Court finds that the complaint should be dismissed and that the proposal adopted by the PCBE on December 29, 1992, and submitted to the Court in 1993 should be and is hereby accepted.

19. The Court adopts the plan submitted on January 6, 1993, and sets the election which was postponed from September of 1992 to coincide with the annual school election of September 21, 1993, and orders that the plan be implemented for that and future school elections.

SO ORDERED.

Proposal # 4

ATTACHMENT B

Voting Precincts

Prepared by METROPLAN

1470

Voting Precincts

PLAINTIFF'S EXHIBIT "A"

Prepared by METROPLAN